## WELDON *v.* STATE.

### Opinion delivered April 13, 1925.

1. HOMICIDE—JURY QUESTIONS.—Testimony held sufficient, in a prosecution for murder, to justify submission of questions whether defendant killed deceased and whether such killing was murder in the first degree.

2. HOMICIDE—PREMEDITATION.—Premeditation and deliberation will not be presumed from the mere fact that the killing was done with a deadly weapon.

3. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Evidence *held* sufficient to sustain finding that defendant killed deceased with deliberation and premeditation.

4. HOMICIDE—MOTIVE—EVIDENCE.—In a prosecution for murder, evidence that deceased was a forest ranger whose duties required him to report liquor violations, and that defendant was violating such laws, was competent and relevant on the issue of a motive for the killing.

5. CRIMINAL LAW—INSTRUCTION—WEIGHT OF EVIDENCE.—Where there was evidence that deceased's duty was to report liquor violations and that defendant was engaged in violating the liquor laws, an instruction that the jury might consider liquor violations if they find that defendant killed deceased, as tending to shed light, if it shed any, upon the motive of the killing, *held* not to be on the weight of the testimony nor to invade the jury's province.

Appeal from Yell Circuit Court, Danville District; *J. T. Bullock,* Judge; affirmed.

*W. P. Strait* and *Wilson & Majors,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. The appellant was indicted in the Yell Circuit Court of the crime of murder in the first degree in the killing of one W. D. Jones. The jury returned a verdict finding him guilty of murder in the first degree and fixing his punishment at life imprisonment in the State Penitentiary. From the judgment rendered in accordance with the verdict, he prosecutes this appeal.

The testimony for the State is substantially as follows: W. D. Jones was a forest ranger. His duty was to patrol the United States Government Forest Reserva-

tion for the purpose of preventing fires, trespass, etc. The forest reservation service was under the control of the Department of Agriculture. The forest rangers were under instructions of the Department of Agriculture to report ''to the federal and local prohibition officers the location of illicit local stills which are noticed in the performance of their duties as rangers.''

Bob Weldon lived in Yell County, Arkansas, on his homestead, at the foot of one of the mountains adjoining the reservation. On the night of the 28th of August, 1924, Jones was killed at the home of Weldon. The body was found at a woodpile where there were a few chips and a pine knot or two. It was ten or twelve steps from the body to the gate of the yard fence around Jones' house. The body was near a trail running a little north of east from Weldon's to the McGough place. Jones' head was near one of the washpots. His hat was near by, and also a carbide light. The body was lying on its right side, face on the ground, in the chips, ashes and dirt.. There was quite a lot of blood, when the body was turned over, on the clothes, and the blood had spread something like two feet along the ground by the side of the body. This blood had apparently run from the body. There was so much blood it made a kind of mud on the ground, which came up over the soles of one's shoes. There was blood on sticks of wood that lay away from the body a couple of feet. Some of the blood had run under the wash-kettle. There were three bullet wounds in the body—two about four inches apart, and one almost in the center of the back, a little lower than the other two. There was very little difference between the holes in the back and in the front. It could not be ascertained whether the bullets entered from the back or front. Besides the bullet wounds, there were also knife wounds. Jones was cut from the backbone almost around to the front on the left side and one cut about two or three inches long on the right side. There was also a stab on one side, and one also under the shoulder-blade, and several other cuts on the

body, hands and arms. On the body of Jones were a watch, a pocket-knife and a handkerchief. The knife was closed. There was no weapon of any kind around the body or on it. On an examination of the premises a rifle was found, and on the window-sill of the east room of Weldon's house there was a scabbard for a large pistol, but no pistol in it. Weldon had a large Luger pistol.

The government had planned the erection of an observation tower on what was called Powell's Mountain, close to Weldon's homestead, and Jones had been instructed, on the day preceding the night of the killing, to survey a route over which to move material for the tower to the top of the mountain. Jones was directed to look over the route by Weldon's place first, as it was contemplated that they would probably have to go through Weldon's pasture, as that would be a cheaper and better route than the other way. A man by the name of Yates lived about a quarter of a mile from Weldon's. There was a road leading from his house to Weldon's and beyond Weldon's was a trail—kind of old road across Powell Mountain. Jones, Weldon and Yates were at the home of Yates on Thursday morning, and, while there, Jones said something about looking out the best way to get to move the tower to Powell Mountain, and Weldon said he thought the government trail that turned off at Stokes' would be the best route, and Jones replied that it didn't make any difference, just so he didn't have too many logs to cut out of the road, and stated that he would look out the way leading by Weldon's and come back the other way. Jones and Weldon left Yates' house about twelve o'clock, and that was the last time Yates saw Jones alive. About eight or nine o'clock Thursday night Yates heard hollering and shooting in the direction of Weldon's. There were four or five shots. The hollering was like some one trying to holler and couldn't. It was a weird kind of noise. Yates was sleeping on his front porch. The shooting and hollering was going on when he awoke. He heard the hollering and shooting,

and started to Weldon's house after he heard the second shot. He got about half-way there. The hollering had hushed, and Yates went to within eighty or one hundred yards of Weldon's house. He heard a horse trot around out there, and started back home. When Yates got near Weldon's house, he heard some one say something, but didn't know who it was—sounded like Weldon. There was some shooting while witness was standing up there, and the horse trotted around, and two guns fired. These two shots seemed like they were on the far side of the house from where Yates was standing. Yates then returned home, and heard a gun fire about half-way between his house and Weldon's. Not long after, Weldon came to Yates' house, and Yates asked him what all the shooting was about up there. Weldon replied, "Just shooting into the air." He asked Yates to get up and go home with him, saying that he had had a little trouble up there, and Yates might help him. Weldon had a shot-gun in his hand, and fired the same, demanding, with an oath, that Yates get up and go where the children could not hear him talk. Yates finally started up the road with Weldon, but told him that he could not go to his house, and asked Weldon what kind of trouble he had had up there, and Weldon replied, "I think there was two or three Ku Klux run in on me. They called me out to the gate, and some one struck me across the head. We had it around and around there, and I left my troubles laying in the chip-yard." When Yates refused to proceed further with Weldon, Weldon said, "If I have got to stay by myself, I want to get off the road," and he did go off to the side of the road, twenty-five or thirty steps, and lay down and put his gun beside him. Next morning about sun-up Yates went to where he had left Weldon the night before, and found him there. Weldon asked Yates to go home with him. Weldon had blood on his arms and fingers and finger-nails and on his body—looked like right smart blood. Yates had noticed the blood the night before, and Weldon had said that night, "I can't hardly

stand to smell this damned blood.'' Yates went with Weldon to Weldon's house. Weldon walked straight to Jones and pulled his shirt bosom open, and then walked back between the gate and Yates, and said, ''By G—, I wish I knew some way to get out of this.'' Yates said, ''I could not tell you.'' Weldon asked Yates what he was going to do, and Yates said he was going after somebody. Yates left Weldon standing there, and, when Yates got back with help, Weldon was gone, and the body of Jones was still lying there.

It was shown that Weldon went to the home of Ed Odom, in Montgomery County, about fifteen miles away. Odom had been his friend for many years, and was still his friend. He arrived at Odom's house on Friday, and went to the field where Odom was working, about three o'clock of that day, and said to Odom, ''I am in trouble, or somebody is in trouble to my credit. There was a man found at my gate, one of my best friends—one among my best friends was found at my wash place, dead, this morning. I thought I would dodge out two or three days. I didn't know but what they would take me up and mob me or do something. I thought I would dodge out two or three days until the excitement was over, and go in and give up and make bond.'' Weldon wanted Odom and Weldon's father-in-law, Stacey, who also lived in Montgomery County, to go over to Weldon's and stay with his wife until he returned home. Odom went and got Stacey, and returned to Odom's house, and Weldon wanted Odom to get him a pair of shoes and a pair of overalls, and gave Odom the money to buy the same. Odom went for these articles, and, when he returned, Weldon was down in Odom's field. Odom gave Weldon the shoes, and told him that he couldn't get the overalls. In the meantime Stacey had come to Odom's house, and that night, while Odom and Stacey were having a conversation, Weldon would sit there and whistle and kind of hum a little, and then he asked this question: ''How could you commit cold-blood murder?'' Odom told him

that he didn't understand the question, and Weldon again asked, "What can you commit cold-blooded murder with—with a knife?" Odom answered, "Yes,", and asked Weldon how the man was killed—whether he fell dead or was shot, or killed with a knife, and Weldon replied that he thought that he was cut with a knife. Later Odom expressed to Weldon his regret, saying, "Bob, this sure has hurt me, and hurts me worse than anything that has ever occurred," and Weldon replied, "Yes, it has hurt me, Mr. Odom; it has hurt me or ruined me," or something to that effect. The next night Odom told Weldon that the officers had been there looking for him. Weldon asked Odom if he thought they would electrocute him (Weldon). This conversation occurred at Odom's barn on Saturday night. Weldon did not say anything about getting away, but Odom told Weldon that it would be a hard matter for him to get away, and it was during this conversation, and after he started to give up, that Weldon asked if Odom thought they would electrocute him. In a further conversation, on Saturday night, at Odom's barn, Weldon said, "I haven't told anything yet," and then commenced to tell Odom about when the man came to his house and when he left. Weldon said it was about eight o'clock when the man came to his house, the best he could remember. Somebody came there and hollered him out, and he went out in the yard, and some fellow said, "Oh, yes, G— d— you, we got you right where we want you now," and hit him with something and knocked him down, and Weldon said a fight then commenced. They went around and around, and when he (Weldon) came to himself, or got away, he made for the kitchen door, and there was one man running west of the house and one running east, the one north of the house running east and the one on the west going south, and he (Weldon) got in his house, grabbed his gun, and through excitement and scare, cocked it, pulled the trigger, and it went off in the house. Then he went out of the door and out in the yard and

shot it.   It was further shown that Weldon had no land in cultivation on the place on which he had lived for the last ten or twelve years.

Weldon testified that on Thursday, when he and Jones left the home of Yates together and went to Weldon's house, Jones had some whiskey, which they drank on the way to Weldon's house. Weldon had whiskey at his home, and, after he and Jones got to Weldon's, they continued their drinking until late in the afternoon, when Jones left, taking a trail in a westerly direction across the mountain.   Weldon's testimony shows that, after Jones left his home late in the afternoon, he (Weldon) became very drunk, and lay down across his bed and went to sleep about five or six o'clock in the afternoon; that, about eight or nine o'clock, some one aroused him, calling him from his west yard gate, from which the trail leads that Jones had taken in the late afternoon.   He was in a drunken stupor, but got up and went to the gate.   He went through this gate and approached a man who was standing there, but whom he didn't know; that the man struck him across the head and knocked him down, rendering him completely insensible.   The next thing he knew he was getting up off of a man; that, as he arose, he saw two other persons, one in his yard and the other to the east and on the outside of his yard.   He faintly remembered that he went into the northwest door of his home to get his shotgun, thinking that he was being mobbed and that his home was being assaulted.   He heard some noise in his house as he went in.   He got his shotgun, and went out to his south door, and, as he started out of the room, both barrels of his gun were discharged, shooting holes in the wall.   He reloaded his gun and went out of the house and around the east end of it, and, as he approached the northwest corner, he saw some one dodging behind his smokehouse; that he fired at the person thus dodging, and struck the corner of the smokehouse with a large number of squirrel-shot.   He faintly remembered that, after firing the shot at the

corner of his smokehouse, the thought came to him that he would have to get help. He then began hollering, left his home, and went to Albert Yates,' about a mile away.

There was testimony corroborating the testimony of appellant as to the showing that there were squirrel-shots through the corner of the smokehouse and that a hole was blown through the wall of the house at the door and in the ceiling of the porch where the shot had lodged. It was shown on cross-examination of Yates that, when Weldon came to his house on Thursday night after the shooting, he was drinking. Yates was asked if Weldon was practically a wild man at the time, and answered, "Yes, he was drinking." The witness, in answer to further questions, stated that he gave down and went to sleep on the side of the road. On cross-examination of appellant, he stated, among other things, that he didn't get a light that night to see who the man was on whom he was lying when he came to himself. The shock came over him, and he left. He didn't know that the man was hurt. He could feel the blood on himself later. He changed his clothes over in the hills about two miles from his home, a couple of miles from where he left the gun. He threw his clothes under a brush-pile—they were bloody. He got a change of clothing before he left home. He knew that he had not cut the man or shot him. He could not have done anything to him. There was no chance for him to do anything.

Mrs. Jones testified for the State, in rebuttal, that she never knew of her husband drinking whiskey—never smelled it on his breath. Yates also testified that he never knew of Jones drinking. It was shown that there was a distillery within a mile and a quarter or a mile and a half of Bob Weldon's house. His house was the nearest house to the still.

The above are the salient facts developed at the trial of the cause.

The appellant prayed the court to instruct the jury to the effect that the mere proof of malicious killing of

the deceased by the appellant would not of itself constitute murder in the first degree; that it must appear from the evidence, beyond a reasonable doubt, that the slaying was done by the appellant of malice aforethought and after deliberation and premeditation; that, although the jury might find that appellant slew the deceased with a deadly weapon, still that would not justify the jury in returning a verdict of guilty of murder in the first degree, unless they believed from the testimony, beyond a reasonable doubt, that the appellant possessed sufficient mind at the time to, and did, deliberate and premeditate upon such act, and thereafter maliciously slew the deceased. The court refused these prayers, to which appellant duly excepted.

Among other instructions the court gave instruction No. 30, in part, as follows: "You may consider the testimony of liquor law violations also, if you find the defendant killed the deceased, as tending to shed whatever light it may shed, if it sheds any, upon the motive that prompted the defendant to kill the deceased, but consider this testimony for no other purpose." The appellant duly objected and excepted to the giving of this instruction.

1. The appellant testified that he did not kill Jones; that, on the night of the killing, he was aroused by some one calling him; that he was stupidly drunk, but, in response to the voice, he went to the northeast gate, and, when he got out of it, "some one cracked him over the head," rendering him insensible. When he came to himself he was getting up off of a man. He saw two men leaving, ran into the house and got his shotgun, and, in his excitement and for his protection, fired the same. There was testimony corroborating the testimony of appellant to the effect that a shotgun was fired in appellant's house and into the corner of his smokehouse, and there was also testimony to the effect that there were no evidences of a struggle where Jones' body was found. There was testimony also that there was some human

hair found on the gate-post which corresponded to the color of appellant's hair, and there was blood on the gate-post.

The appellant's contention therefore is that Jones was killed by other parties and placed in the position in which he was found on appellant's premises, and that appellant was knocked senseless, and placed on Jones' dead body. The appellant further contends that, even if the evidence were sufficient to prove that he killed Jones, there is no testimony to justify a verdict against him of murder in the first degree. On the other hand, it is the contention of the State that the circumstances established by the testimony are sufficient to prove that the appellant killed Jones by shooting him with a rifle or pistol and by cutting him with a knife, and that the jury was justified from the circumstances in finding that the killing of Jones by appellant was murder in the first degree.

The testimony was sufficient to justify the court in submitting to the jury the issue as to whether or not the appellant killed Jones and whether such killing was murder in the first degree. The court, in its instructions, correctly and clearly defined all the degrees of criminal homicide, and also correctly declared the law on justifible homicide. The court also fully and accurately instructed the jury on the issue as to whether or not the appellant, by reason of his intoxication, had sufficient mental capacity to deliberate and premeditate upon the act of killing Jones. The charge of the court on the law of criminal homicide, self-defense, presumption of innocence, reasonable doubt, credibility of witnesses, circumstantial evidence, and the effect of intoxication as a defense, was exceedingly comprehensive and accurate, and in conformity with many decisions of this court. Such of appellant's prayers for instructions as were correct were fully covered by instructions given by the court.

Learned counsel for appellant contends that the testimony for the State, at most, could only justify the jury in finding the appellant guilty of murder in the second degree; that the testimony showed nothing more than that the killing was done with a deadly weapon, from which the jury might infer malice, but that there was nothing in the testimony to warrant the jury in finding that the killing was done with premeditation and deliberation. When nothing more is shown than the mere fact that the killing was done with a deadly weapon, premeditation and deliberation will not be inferred or presumed from such fact alone. *McAdams* v. *State,* 25 Ark. 405; *Fitzpatrick* v. *State,* 37 Ark. 238; *Burris* v. *State,* 38 Ark. 221; *Greene* v. *State,* 51 Ark. 189; *Howard* v. *State,* 82 Ark. 102; *Ferguson* v. *State,* 92 Ark. 124. But there was far more shown here than the mere naked fact of the killing of Jones with a deadly weapon. The very manner in which the deadly weapons were used was sufficient to justify the jury in finding that whoever killed Jones used the weapons with a deliberate purpose to kill. Jones' body was perforated three times through the center with bullets from a pistol or rifle, and was also horribly mutilated with a knife. The manner, therefore, in which these deadly weapons were used tended to show that the death of Jones was the result of premeditation and deliberation.

In the case of *Howard* v. *State, supra,* Judge RID-DICK, speaking for the court, said: "But, though malice may be presumed, premeditation and deliberation are not presumed from the mere fact of a killing by the use of a deadly weapon, but must be shown by the manner of the killing and the circumstances under which it was done, or from other facts in evidence."

In 2 Brill's Encyclopedia, Criminal Law, ch. 19, § 644, it is said: "Premeditation and deliberation may be inferred as a matter of fact from the circumstances of the case, such as the character of the weapons used, the nature of the wounds inflicted, the acts, conduct and

language of the accused, and the like." See the many authorities cited in the note.

Now, the manner of the killing of Jones and the circumstances under which it was done, as disclosed by this record, fully warranted the jury in finding that the killing of Jones was murder in the first degree. The jury scouted, as well they might, the testimony and theory of appellant to the effect that Jones was killed by some one else and his dead body brought and placed where it was found, and that appellant, after being knocked insensible, was placed upon Jones' dead body. For it is reasonably certain, from the nature of the wounds on, and the great quantity of blood under and around, the body of Jones, that he was killed on or near the spot where his body was found. Not only the nature of the wounds inflicted, but likewise the acts and declarations of the appellant on the night of, and immediately after, the killing, and on the day following, as set forth in detail above, tended strongly to prove that he was the victim of those inescapable torments that usually come to one who is guilty of deliberate murder. Appellant told Yates that night that he had "left his troubles in the chip-yard," but it seems that they haunted him still, for, the next morning, when Yates returned with him to the spot, he pulled Jones' shirt bosom open and said, "By G—, I wish I knowed some way to get out of this." Appellant, as the jury might have found, lost his knife, and hid the gun with which the bloody deed was done; he feared the mob, and fled to the home of his friend Odom, and, while there, asked Odom, "How could you commit cold-blooded murder—with a knife?" On the night of, and immediately after, the killing, with blood still on his hands, arms and clothes, he exclaimed to Yates, "I can't hardly stand to smell this damn blood," and the next day he hid the bloody clothes under a brush-pile. The jury might have found that these circumstances were the manifestations and outcry of conscious guilt. This is a tendency not uncommon in those who

have deliberately committed murder, as shown by the greatest delineator of human character when he has Lady Macbeth to say:

"Out, damned spot! out I say! * * *Here's the smell of the blood still; all the perfumes of Arabia will not sweeten this little hand. Oh, oh, oh!"

Act fifth, sc. 1, Macbeth.

The jury were fully warranted in finding, from the circumstances above detailed, not only that appellant killed Jones, but that he did so with premeditation and deliberation.

2. The appellant also contends that the court erred in giving that part of instruction No. 30, set out above, telling the jury, in effect, that they might consider the testimony of liquor law violations as tending to shed whatever light it might shed, if any, on the motive that prompted the appellant to kill the deceased.

In *Sneed* v. *State*, 159 Ark. 65, we said: "While it is competent to prove the presence or absence of motive in determining the issue of guilt or innocence, and while such proof is always a cogent factor relative to that issue, yet, if the testimony be otherwise legally sufficient to prove guilt, a verdict of guilty cannot be set aside because of failure to prove a motive for the crime."

The testimony on the part of the State tending to show that Jones was a forest ranger whose duties required him to report violations of the liquor laws, and that the appellant was violating these laws, was competent and relevant on the issue as to whether or not appellant had a motive to kill Jones. The instruction complained of was predicated upon this testimony, and was so phrased as to leave the jury free to determine what weight they would give to it in considering whether or not appellant had a motive for the crime charged. The instruction was not on the weight of the evidence, and therefore did not invade the province of the jury. The instruction did not, as appellant's counsel contends, suggest that there was a motive for the killing, but only told

the jury that they might consider the testimony as tending to shed whatever light it might shed, if any, in determining whether there was a motive for the crime, and that it could be considered for no other purpose. The instruction in this form was not prejudicial.

The record presents no reversible error, and the judgment is therefore affirmed.