HARRIS ULMER *v.* STATE OF ARKANSAS

5719                                      484 S.W. 2d 691

Opinion delivered September 25, 1972

*William C. McArthur,* for appellant.

*Ray Thornton,* Atty. Gen., by: *Jay N. Tolley,* Asst. Atty., Gen., for appellee.

JOHN A. FOGLEMAN, Justice. On August 4, 1971, Harris (Tootsie) Ulmer was found guilty of first degree murder of Paul Guajardo on the 26th day of June, 1971. He asks us to reverse the judgment on the following grounds:

I. The trial court erred in modifying defendant's instruction number three as tendered and subsequently giving the modified version in the instructions to the jury.

II. The trial court erred in failing to declare a mistrial due to unsupported and inflammatory statements by the prosecuting attorney in his closing arguments to the jury.

III. The trial court erred in allowing, in rebuttal restimony by Deputy Sheriff Comer Johnson and Chief

Deputy Prosecuting Attorney Robert Brown, references to prior statements by defense witness Evonne Smith without the introduction of the available written transcripts of the prior statements.

IV. The evidence as elicited at the trial is insufficient to sustain the jury's verdict of murder in the first degree.

At the outset, we will say that we have carefully reviewed the evidence in the light most favorable to the state, and are unable to say that there is no substantial evidence to support the jury verdict. The principal argument advanced by appellant on this point is that the evidence clearly shows that he acted in the heat of passion, and without deliberation and premeditation. We do not agree.

There was testimony showing that: after a 20-or 30-minute exchange of words among Ulmer, the deceased, Alex Guajardo and Johnny Whitehead, across the street from Smith's DX Station, Paul and Alex Guajardo returned to the service station, where they had been before leaving to talk to Whitehead; during the conversation Ulmer had remonstrated with Whitehead about alleged mistreatment of Ulmer's sister, the wife of the operator of the station, who assisted in the business, and the deceased demanded an apology by Ulmer to Whitehead for maligning Whitehead's father; Paul, standing by a soft drink box at the service station, then exchanged words with appellant and appellant went into the building and emerged three or four minutes later carrying a .22-caliber pistol with which he immediately shot Paul Guajardo, who died as a result of the wound then inflicted; Paul Guajardo was in a sitting position talking to Ulmer's sister when shot, and Ulmer fired the shot at a "downward angle"; the shot that caused decedent's death entered his right chest and went downward and posteriorly, indicating that it came from above and the right of the victim's head; Ulmer's sister prevented him from firing other shots at one or both of the Guajardo brothers. Premeditation and deliberation may be inferred from the circumstances of the case, such as the character of the weapon used and the manner in

which it was used, the nature of the wounds inflicted, the conduct of the accused and the like. *House* v. *State,* 230 Ark. 622, 324 S.W. 2d 112; *Weldon* v. *State,* 168 Ark. 534, 270 S.W. 968. See also, *Walker* v. *State,* 241 Ark. 300, 408 S.W. 2d 905, appeal dismissed, cert. denied, 386 U.S. 682, 87 S. Ct. 1325, 18 L. Ed. 2d 403, reh. denied, 387 U.S. 926, 82 S. Ct. 2027, 18 L. Ed. 2d 987.

Whatever may have occurred between Ulmer and Paul Guajardo, prior to the time Ulmer went into the service station, admittedly to retrieve the pistol he had left there, it was within the province of the jury to find that the shooting of Guajardo was a deliberate, premeditated act, regardless of any previous provocation.

We find no error in the court's modification of appellant's requested instruction No. 3. As offered, the instruction read:

It is competent to prove threats made against the other, if such have been made, for the purpose of shedding light upon the state of mind existing between the parties at the time of the difficulty, and also for the purpose of shedding light upon which was the aggressor in the combat. Likewise, it is competent to prove similar communications made to the defendant. Threats, or such other communications are to be considered by you, if any such were made, for the purpose of shedding light as to the condition of mind between the two parties at the time of the difficulty, and as I have said before, to shed light upon which was the aggressor in the difficulty.

As modified and given, it read:

It is competent to prove threats or other communications made by one against the other, if such have been made, for the purpose of shedding light upon the state of mind existing between the parties at the time of the difficulty, and also for the purpose of shedding light upon which was the assailant in the combat.

Appellant's objection to the instruction as given was a general one, which did not mention the ground now ar-

gued.[1] In the first place, we do not agree that the court's action was arbitrary. It is a much clearer and more concise instruction, as modified. We do not know of any rule that prevents the court from modifying a requested instruction to achieve such an end, even though the instruction as requested may not be an erroneous declaration of law. Circuit judges should be encouraged to do this, not discouraged. Furthermore, we do not agree with appellant that the modification so emphasized the consideration of threats as to limit the jury's consideration of "similar communications" or "non-verbal aggressive acts."

During the opening argument on behalf of the state, appellant's trial counsel (not the same attorney representing him on this appeal) objected to the following statement by a deputy prosecuting attorney:

MR. HAMNER:

. . . Well, Mr. Rosteck asked them, "My goodness, didn't you have time to take that knife out of his pocket on the way to the hospital?" What did she say? She said, "My husband was dying. I didn't think about it."

MR. ROSTECK:

Now, if the Court please, I did not say that and I object to him making an inference that I even suggested she took a knife out of her husband's pocket and I don't like it.

In the closing argument the following occurred:

MR. ANDERSON:[2]

. . . He jumped on him a third time. He said, "I want to know, it's important, what was it? You remem-

---

[1]In trials taking place after December 31, 1971, we do not consider any general objection to a jury instruction. See Rule XIII of Uniform Rules for Circuit and Chancery Courts, adopted by per curiam order of December 31, 1971.
[2]Another deputy prosecuting attorney.

ber, I got up and objected; badgering the witness. He had answered, he had said he didn't know.

MR. ROSTECK:

If the Court please, I want to object, now. I know that this Court knows and the jury knows that when Alex testified on that thing he first told me he was sitting on the ground and I asked him and he said, "Yeah." I don't want him misrepresenting the facts here. I am getting tired of this.

MR. ANDERSON:

Well, I was not misrepresenting the facts. I am sure they will agree. May I continue, Your Honor?

THE COURT:

Go ahead. I think the jury can remember what he testified to.

\* \* \*

MR. ANDERSON:

. . . Now, all of the sudden, for the first time she remembers him pulling a knife out with a long, silvery blade right then and advancing upon the defendant.

MR. ROSTECK:

If the Court please, there is no testimony he pulled a knife out of his pocket and advanced on him. I am getting tired of this. I want him to stick to the facts. We emphasized repeatedly that he never pulled a knife out of his pocket at any time. No one saw it. I am getting tired of this.

MR. ANDERSON:

I heard specific mention, Your Honor, of a knife specifically described as a knife, specifically talked about a blade of a knife.

THE COURT:

I don't recall anything like that, but go ahead.

The record discloses that appellant's counsel actually asked Mrs. Guajardo if a knife allegedly possessed by her husband could not have easily been disposed of in the interval between the time he was taken from the service station by his brother Alex and the time they picked her up at her home en route to the hospital. He also asked her whether she or the brother took a knife from Paul and whether this brother could have disposed of the knife before the two reached her house. The witness responded:

I don't think he would have taken time. My husband was dying. He wouldn't have took time to search him.

Alex Guajardo testified on direct examination that, after returning to the service station, his brother Paul was sitting in a chair in front of an ice box and in front of the entrance to the service station building facing and talking to Tiny Smith, who had later returned to the station and was seated when Ulmer came out the door with his gun in his hand, walked three steps, placed the gun "in" Paul's ribs and shot him. On cross-examination this witness was asked to tell what happened and repeated virtually the same version that he had previously given. On a detailed cross-examination as to the position of the two chairs in relation to each other and to other objects, Alex admitted that he might have been mistaken as to the presence of an ice machine on the day of the shooting. Later appellant's counsel again inquired whether Paul was sitting down when shot, and Alex clearly responded that he was, after which the cross-examiner commenced a new course of examination as to the position and activities of Paul Guajardo and Tiny Smith when Ulmer came out with his pistol. When the witness answered detailed questions as to the position of Tiny Smith, appellant's counsel asked the witness if he was as sure about that as he was about anything else, provoking a deputy prosecuting attorney to object that the witness had stated he was "pretty sure," that he did not know for sure and that the cross-examiner was badgering the witness. Thereafter, the court made an inquiry of the witness and ap-

pellant's counsel continued an even more extensive cross-examination of the witness. During the cross-examination, the examiner had previously asked the witness if he were as positive that Paul was sitting as he was about anything else and in questioning the witness about Paul's or Mrs. Smith's position stated "This will be important," "I want you to be sure about this," and "Well, now, I am confused and I am sure the jury is, too. It's important to this defendant as to where she was located, Judge."

In her testimony on direct examination Mrs. Smith said that her brother, Harris Ulmer, went into the service station building, came out and said to his wife who was sitting near the door, "Let's get the hell out of here." When asked if Ulmer said any more to his wife, the witness answered:

> He didn't say any more to her at that time. She had her purse and they was ready to walk off and, so Paul, he taken a couple of steps toward her, and he still had his hand in his pocket, and fumbling around, and he, it looked to me like a knife that he had pulled out of his pocket, and it looked like the blade was open, and when he taken those two steps forward, why, Tootsie looked around, and he had his pistol down between his belt and his shirt here (demonstrating), and it just automatically came out.

Later, but still on direct examination, the following questions and answers are recorded:

> Q. Now, if you were there, and you said Paul took a step or two, that would put him right more or less in this angle in front of you, would it not?
>
> A. Yes, sir.
>
> Q. Is that right?
>
> A. Yes, sir.
>
> Q. Did you have a good view to his right pocket?
>
> A. Yes, sir.

Q. You did. I want you to be sure, now, Tiny, because it's very important. You said you saw Paul with his hand in his pocket fumbling around?

A. Yes, sir.

Q. Are you sure that you saw what you think or you say was a knife, that you saw in his pocket?

A. Yes, sir, because he pulled it out and it looked like I could see, I would say, that much (indicating) of the blade.

Q. Did he ever pull it all of the way out of his pocket?

A. To the best of my knowledge, no.

Q. He didn't, but he pulled it out enough that you could see what it was?

A. Yes, sir.

Q. And at that instant what did your brother do? What did Tootsie do?

A. You mean, after he shot?

Q. No. After he pulled his knife.

A. That's when he looked around and he seen that he pulled something out of his pocket, because—

Q. (Interposing) You don't know what Tootsie saw. What did Tootsie do?

A. That's when he shot.

Whatever deviation there was from the testimony and from the occurrences taking place during the examination of Mrs. Smith, the argument was not so devoid of evidentiary foundation as to justify the declaration of a mistrial. Appellant did not move for a mistrial, and the cir-

cuit court reminded the jury just before it retired that the arguments of the attorneys were not evidence, adding:

> It's up to you to remember what the testimony was in the case, and you are instructed that as far as evidence in the case, there is no indication that the knife actually was out. I think there was some rebuttal testimony going to one of the witnesses credibility regarding the knife being out, but that is not to be considered as evidence in the case, only goes to the credibility of the witness.

The trial judge was in a better position to judge the effect of the arguments than anyone else, and his admonition to the jury having been given without objection by anyone and without any request for any other action, we cannot say that any prejudicial error was committed.

Appellant contends that the circuit judge erred in permitting Deputy Sheriff Comer Johnson and Chief Deputy Prosecuting Attorney Robert Brown to testify orally, in rebuttal, about statements made to them by Evonne (Tiny) Smith, appellant's sister, which were contradictory of her testimony as a witness for appellant, without introducing written statements given these officials by this witness. Appellant argues here that this violated the best evidence rule. No such objection was made in the trial court. As a matter of fact, appellant's objection to introduction of written statements made by this witness was sustained by the circuit judge simply because the statements had not been identified by her. Appellant is in no position to raise the question now argued by him for the first time on appeal.

We find no reversible error and affirm the judgment.