Tiner *v.* State.

5150                                394 S. W. 2d 608

Opinion delivered October 18, 1965.

*Milham* and *Weid,* for appellant.

*Bruce Bennett,* Attorney General, By: *Fletcher Jackson,* Asst. Atty. General, for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Milton Tiner, was found guilty of the crime of manslaughter by a Saline County jury, the Information alleging that he feloniously killed the unborn quick child of Mary Mattison by striking Mary Mattison with an automobile in violation of Ark. Stat. Ann. § 41-2223 (Repl. 1964). His punishment was fixed at a fine of $1,000.00, and confinement for three years in the penitentiary. The jury recommended a suspended sentence, but the court only suspended the fine, and entered judgment sentencing Tiner to the prison term. From such judgment, appellant brings this appeal. For reversal, appellant urges a number of errors, which we proceed to discuss.

It is first asserted that there is insufficient competent evidence to sustain the verdict. Proof on the part of the state reflected that Tiner, who formerly lived in Saline County, but presently resides in Dallas, Texas, had returned to Benton with his older brother, who also lived in Dallas, for a visit with his mother. Appellant owned a 1955 black Ford automobile, which had been left at his mother's home. On March 15, 1964, in the late afternoon (''around 4, or 5, 6,'' according to Tiner), he left the home in Benton in this automobile for the purpose of returning to Dallas. On this same afternoon (between 5:30 and 6:00) Mary Mattison Brown, a resident of Benton, was walking west on the right side of Hazel Street, off the pavement, accompanied by her Mother. Mrs. Brown, who was unmarried at the time, was pregnant, and took a walk every afternoon. She remembered nothing, except that she was walking along at the side of the street: ''I blacked out when I got hit.'' Mrs. Weaver, the Mother, testified that the occurrence took place on a Sunday afternoon around supper time, and that there was no traffic from either direction; that suddenly, ''I heard a car coming behind us making a great roar.'' She stated that she was walking almost in a ditch by the side of the street, and that her daughter

was off the pavement. "She was along the frazzled edge." According to this witness, the driver of the car appeared to intentionally strike her daughter: "He kept hitting her and hitting her with me screaming, 'Don't, don't, stop, stop, stop!' He kept on hitting her like he was pushing a bulldozer. * * * After he hit her many times he used the automobile like a bulldozer and pushed her over to the telephone pole." Mrs. Weaver identified the car as a black Ford, and stated that only the driver was present in the car. After knocking Mrs. Brown to the ground, the driver sped away.

Mrs. Elaine Housley testified that on the Sunday afternoon in question, appellant gave her a ride to a store; that he was driving an old model black Ford. The witness testified that she was with him ten to fifteen minutes, and got out of the car around 5:15.

Louis Wright, of Malvern, testified that he was fixing a flat at Tom Gill's wrecking yard, located about two miles from Malvern, at approximately 6:30, when appellant drove up in a 1955 black Ford, which had a flat. Tiner was looking for a jack, and Wright told him, "He could use mine," whereupon, Tiner replied " 'No, that his brother would be by in a few minutes and he would wait for him.' " Wright noticed the bent fender, but paid no further attention until Tuesday morning when he heard on the radio that officers were searching for a black 1955 Ford with the right headlight out.

Bill Dyer, Deputy Sheriff of Saline County, and James Robinson, with the sheriff's department of Hot Spring County, testified that they found "a ball of hair that was stuck under the chrome piece on the top right front fender."

Tiner, after leaving his car at the wrecking yard, was picked up by his brother, who was on his way back to Texas. After being arrested, appellant denied that he had struck any person,[1] but admitted that the automobile in question belonged to him. He was unable to give any

[1] Tiner, during his testimony, stated that he did not know Mrs. Brown. Q. "Did you know the Mattison girl, Brown now, who was struck here?" A. "No, sir. I never saw her before."

reason for the right headlight being broken out, nor did he offer any explanation about the ball of hair that was found on the right side of the car. He stated that he drove from Benton to Malvern at about fifty miles per hour, and, after the tire went flat, stopped at the wrecking yard. From the record:

"Q. Did you inquire about a jack?

A. I did.

Q. It was either this man or some other man you inquired about, is that correct?

A. Correct.

Q. Did he tell you you could take the jack out from under the car and use it?

A. I don't remember about that.

Q. You didn't take the jack out there and put it under your car?

A. No.

Q. Why did you change your mind?

A. I was wanting to go on to Dallas."

To summarize, the testimony reflects that an automobile, admittedly owned, and operated, by appellant during the period of time when Mrs. Brown was struck (and conforming to the description of the car involved) was left in a strange town—with the right fender bent—the headlight knocked out—and with hair under the chrome on the right fender—and appellant was unable to explain these facts. In addition, he commenced the trip to Dallas in his own automobile, but only drove as far as Malvern, from Benton, when, simply because he had a flat tire, left his automobile at a wrecking yard, and proceeded to ride on to Dallas with his brother. The transcript does not reflect that Tiner gave any directions to any person for the disposal of the automobile. As far as the record discloses, he simply abandoned the vehicle. This evidence, though circumstantial, was, we think, sufficient to sustain the jury finding that Tiner was the operator of the automobile which struck Mrs. Brown.

Dr. Curtis Jones, Jr., testified that he arrived at the Benton Hospital about 6:30 P.M. for the purpose of making his "evening rounds;" that an ambulance arrived with a patient for the emergency room, and he was called to assist. Dr. Jones stated that Mrs. Brown was unconcious, had no pulse, and no blood pressure, and, in fact, appeared to be dead:

"Of course, our immediate concern was to try to establish a pulse and pressure, so we started plasma, and blood later. After that was started, examination revealed possible skull fracture. She had one pupil slightly dilated which indicates concussion or pressure of some sort. She was apparently 7-7½ months pregnant. No fetal heart tones. The baby was dead. She was bleeding vaginally, bright red blood. She was also leaking amniotic fluid. She had fractures of the left leg and ankle, both bones. She had multiple abrasions and lacerations. I had her up here about an hour and finally established pressure for her enough to transfer her to Little Rock.

\* \* \*

"Q. Doctor, you say there was a leakage from the amniotic fluids?

A. The membrane apparently ruptured. Amniotic fluid, the membrane that contains the baby, has a very distinct, unmistakable odor to it. Obviously fresh, and of course bright red bleeding vaginally.

Q. What did that indicate to you, doctor?

A. The blow or accident she had been involved in, apparently she had been struck in the abdomen with force enough to cause separation of the placinta or a laceration of the uterus. The force of the blow itself would cause blood amniotic fluid to come through the birth canal and leaking externally. She had internal hemorrhaging, too."

Dr. James Porter of Little Rock testified that it first appeared as though Mrs. Brown would die; that she was carrying a child, and a hysterectomy was performed. According to his evidence, the uterus, tubes,

womb, overies, and the baby were removed during the surgery. The doctor testified that the baby was dead at the time of delivery, but he could not definitely say how long it had been dead, nor could he positively state that the blow received by the Mother had caused the death of the unborn child. However, he did definitely state that the length of time that the baby had been dead was a matter of hours, rather than a matter of days. According to his evidence, the baby was normal, and he testified that the Mother's injuries were sufficient to have caused the death of the child.

Mrs. Brown testified:

"I felt it move that day. It moved a lot. I felt it move that day."

We have concluded that the evidence was sufficient to support the conviction.

Appellant's Points Nos. 2 and 3 relate to the *voir dire*. It is asserted that the court erred in refusing to permit counsel to question the jurors relative to their qualifications, by asking if they were in any way connected with a civil suit filed on August 7, 1964, by Mrs. Brown, in which she sought damages from appellant in the amount of $125,000.00. Further, it is asserted that the court erred in refusing to permit counsel to ask the members of the jury if any were represented by either of the attorneys in the civil case. The court ruled that appellant was being tried on a criminal charge, and that there was no relationship between the criminal case and any civil litigation.

We find no prejudicial error in this ruling. The record reflects that the court had already asked the members of the jury if they were related to the litigants, and the record further reflects that the attorneys representing the state are not connected with the litigation. We have held that a criminal conviction cannot be given in evidence in a later civil suit to establish the truth of the facts in which it was rendered, *Horn* v. *Cole, Administrator,* 203 Ark. 361, 156 S. W. 2d 787, and we fail to see how it was relevant to inquire about a relationship to attor-

neys in a civil suit, not then before the court, and which, for that matter, might never come to trial. Appellant cites no authority for this argument, and, in fact, only devotes a six-line paragraph in his brief in support of it.

For alleged error No. 5, appellant contends that the court erred in refusing appellant the right to question the prosecuting witness relative to the facts alleged in her complaint against defendant in the civil action filed against him. Again, we find no error. The rule is stated in 22A C. J. S., "Criminal Law," Section 633, Page 489, as follows:

"Where not a part of the res gestae, * * * the conduct of the person injured, subsequent to the commission of the crime, is irrellevant, and thus the fact that the injured person filed a civil action against accused is generally not admissible in evidence."

It is asserted that the court erred in refusing to sustain defendant's objections to each of the jurors for the reason that they had not registered, and were therefore not qualified as electors, a requirement for jury service. Constitutional Amendment 51 provides for voter registration without poll tax payment, and became effective January 1, 1965. The amendment set out that persons who were qualified electors as of December 31, 1964, should be permitted to vote in any election before March 1, 1965. The drafters of the amendment apparently contemplated that voter registration machinery would be in operation by March 1, 1965, but this did not occur. When it appeared that pending litigation would prevent registration of voters for some period of time, the General Assembly passed Act 126, which provides that all persons who are otherwise qualified under applicable statutes to be grand or petit jurors, and who have paid a poll tax between October 1, 1963, and October 1, 1965, are eligible to serve as jurors. We upheld this act on September 13, 1965, in the case of *Richard Coger* v. *City of Fayetteville*. It follows that this point is without merit.

In point No. 7, it is alleged that prejudicial error was committed by the giving of the court's Instruction No. 1 over defendant's general objections, the instruction

defining murder in the second degree.[2] This did not constitute error. Ark Stat. Ann. § 41-2223 (Repl. 1964) provides as follows:

"The wilful killing of an unborn, quick child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be adjudged manslaughter."

It was necessary that murder be defined in order that the jury determine whether appellant was guilty of manslaughter in causing the death of Mrs. Brown's unborn child. Let it be remembered that the testimony of Mrs. Weaver, Mother of Mrs. Brown, justified this instruction, for certainly the testimony of this witness made a jury question as to whether appellant would have been guilty of murder if Mrs. Brown had died. Actually, subsequent instructions properly defined involuntary manslaughter, though this was not necessary since the Information (charge) was based on Section 41-2223. As stated, the questioned instruction was entirely proper, but were it otherwise, no prejudicial error occurred, for the jury only returned a verdict for manslaughter, and even recommended a suspended sentence.

Appellant complains that the Information charged him with the crime of involuntary manslaughter, but that he was convicted of manslaughter, and the conviction was thus of a higher degree than charged. This was no error. "Manslaughter" includes both voluntary and involuntary degrees. The punishment fixed by the jury was that of involuntary manslaughter, though actually, under Section 41-2223, it would appear that Tiner might have been adjudged guilty of voluntary manslaughter. Be that as it may, appellant cannot complain of any possible error that, if having any effect, inured to his benefit.

Several points can be disposed of together. In Point No. 6, it is contended that the court erred in permitting Sheriff Grant to testify as to statements made to him

---

[2] Appellant's Point No. 8 refers to the court's instruction defining malice, and Point No. 9 asserts as error the court's instruction dealing with killing an unborn child. These instructions were not error for the reason herein given under Point No. 7.

by the witness, Wilton Tiner. In *Carter* v. *State,* 230 Ark. 646, 326 S. W. 2d 791, we said:

"This alleged error was first raised by appellant in his motion for a new trial. It comes too late for this court to consider it. We have consistently adhered to the rule that before an alleged error, in felony cases of a lesser degree than capital, may be considered by this court on appeal, the complaining party must first make an objection, call for a ruling from the trial court, make and preserve an exception from an adverse ruling, and the matter complained of must be assigned as error in a motion for a new trial."

Here, appellant did not save his exception to the adverse ruling of the court, and we are accordingly unable to consider this point. For his eleventh point, appellant complains that the court erred in giving State's Instruction No. 4, but this alleged error is not brought forward in the motion for a new trial. Likewise, Points 13 and 14, which relate to the court's refusal to grant instructions which were asked by appellant, were not mentioned in the motion for new trial; however, it might be stated that he contents of these instructions were covered in other instructions given by the court, except for one phrase, which was incorrect.

For his final point of alleged error, appellant asserts that the court erred in permitting the prosecuting attorney to make certain remarks to the jury. Here too, appellant made no exception to the adverse ruling on his objection, and a discussion of the prosecutor's statement (which was only a matter of opinion) is unnecessary.

Finding no reversible error, the judgment is affirmed.

It is so ordered.