JAMES DEAN WALKER v. STATE OF ARKANSAS

408 S. W. 2d 905

Opinion delivered October 31, 1966
[Rehearing denied December 12, 1966.]

*Howell, Price & Worsham,* for appellant.

*Bruce Bennett,* Attorney General; *Jerry W. Faubus,* Asst. Atty. Gen., for appellee.

OSRO COBB, Justice. Appellant prosecutes this ap-

peal from his conviction of the offense of murder in the first degree. The victim was Jerral Vaughn of the North Little Rock Police Department. This is the second time that appellant has been tried and convicted of the particular crime. In *Walker* v. *State*, 239 Ark. 172, 388 S. W. 2d (1965), we reversed his previous conviction and remanded the case for a new trial.

## INTRODUCTORY FACTS:

At about 2:30 a.m. on the 16th day of April, 1963, the North Little Rock Police Department was under an alert to stop and investigate a cream colored Oldsmobile. Such a car was first observed by Officer Gene Barrentine, who "tailed" the vehicle as it was proceeding through what is known as Rose City toward England. When Officer Barrentine learned through his radio communications that Officer Vaughn was directly behind him and aware of the situation, he started flashing his red dome light and the cream colored Oldsmobile pulled over and stopped. Officer Barrentine stopped his car directly behind the suspect car. Vaughn stopped his car behind and to the left side of the Barrentine car. The driver of the Oldsmobile, later identified as Freeman Kumpe, got out and came around to the left rear of the Oldsmobile and met Barrentine. While Barrentine was beginning a search of Kumpe, Officer Vaughn went around the right rear of the Oldsmobile, ostensibly to check the other passengers in the car. Almost in the instant that Vaughn disappeared around the right rear of the Oldsmobile, a fusillade of gunfire erupted, the autopsy report subsequently reflecting that Officer Vaughn was killed by a bullet entering his body at the front side of his chest in the heart area.

When Officer Barrentine saw the body of his fellow-officer fall to the ground, he started shooting through the Oldsmobile in the general direction of the right front door. Photographic exhibits introduced in evidence show that two of such shots were fired into

the body of the Oldsmobile at a point slightly below the back windshield. The back windshield was completely shot out and after the shooting appellant was found in a semi-conscious condition lying on the ground upon an empty .38 Smith & Wesson revolver. Appellant was hospitalized and survived the shooting, it being found that he had been shot five times in the course of the exchange of fire. During the excitement of the gunfire, Kumpe temporarily escaped but was captured in a matter of minutes. Officer Barrentine shot twice at Kumpe but missed.

Linda Ford had been riding in the front seat of the Oldsmobile between Kumpe, the driver, and appellant, who was seated at the right side. During the incident, she jumped from the car and ran back toward the police cars for cover. She testified that appellant had a gun in his hand when he opened the right door of the Oldsmobile to meet Officer Vaughn and that appellant started shooting, being the first to fire. Appellant testified briefly in this case but at no time did he attempt to place a gun in the hands of Linda Ford. Since Kumpe was out of the car and unarmed; Linda Ford had no gun and Officer Vaughn was slain by a bullet fired into his body as he faced appellant, the physical facts leave little, if any, doubt as to the fatal bullet coming from a gun fired by appellant.

Appellant's court-appointed attorney began intensive labors in the case in April of 1965. The case was not reached for trial until late December of that year. Lengthy hearings were conducted by the court on various motions by appellant during the months of preparation for the trial. The first motion of appellant was that he be returned from the State Penitentiary to the Pulaski County Jail for convenience of his counsel in conferring with him and preparing for his trial. The court, on the same day of the motion, April 5, 1965, entered the requested order. Appellant therefore was permitted to remain in jail instead of the penitentiary for some seven months.

The second motion on behalf of appellant was for a sweeping order requiring the State to submit to appellant's attorneys each and all of its tangible objects which were to be used in evidence, for copying or photographing, and including ballistics tests reports on the guns of Officers Vaughn and Barrentine and upon the .38 caliber Smith & Wesson revolver alleged to have belonged to appellant; fingerprint reports, if any, of appellant; autopsy report of Dr. Leo Davenport; the coroner's report as to Officer Vaughn; parrafin test reports as to appellant, and all photographs of police vehicles at the scene. The motion continued by requesting that the three guns involved in the gunfire be turned over to appellant's attorneys for private and independent examination, the same request being made as to the bullets recovered from the body of appellant and the empty shells of the gun alleged to have belonged to appellant. Following hearing, the court granted appellant all of the relief sought in the motion.

When the defense had completed its private examination of tangible, documentary and photographic evidence relied upon by the State, the prosecution moved that appellant be required to make available the results of the ballistics tests on the three guns involved. The court granted this motion, directing appellant, by his attorneys, to file with the clerk as part of the record of proceedings the ballistics report of Stanton O. Berg, Firearms Examiner of Minneapolis, Minnesota. Appellant objected to this order but nevertheless complied therewith. We note here that the order of the court did not relate to the introduction of the ballistics report in evidence, but solely to its availability to the presecution as a part of the record.

Appellant moved for a change of venue, alleging that he could not receive a fair and impartial trial in Pulaski County. The motion involved the testimony and affidavits of some two hundred persons on each side of this contention. A separate volume of transcript is devoted to this motion for change of venue alone. The

motion for change of venue was heard and denied, and thereafter appellant filed a motion to disqualify the trial court because of alleged personal prejudice and bias toward the accused. Here again, a lengthy formal hearing was conducted and the motion was denied.

The next motion filed on behalf of appellant was to quash the jury panel. A formal hearing was held, including the taking of testimony of all three jury commissioners, and the motion was denied. We note that no question is raised on this appeal relating to the qualification of any juror selected to try the case.

The case was finally reached for trial in December, 1965. The trial proper took five days. At the outset of the trial all witnesses were individually called to be sworn and the rule was placed upon them. It is significant that Linda Ford and Mary Louise Roberts did not appear to be sworn.

Early in the trial of the case, the court permitted the State, over the objection of appellant, to read into evidence the testimony of Linda Ford and Mary Louise Roberts as given on direct and cross examination at appellant's first trial. Prior to admitting this evidence, the court required the State to introduce proof of its diligent efforts to locate and serve subpoenas upon the witnesses to compel their attendance and on some three occasions during this proof, the court commented that he much preferred to have the witnesses personally present if possible. The court found that the witnesses were unavailable through no fault of the prosecution and admitted the testimony under the provisions of Ark. Stat. Ann. § 28-713 (Repl. 1962).

At the conclusion of the first trial, appellant was found guilty and the jury imposed the death penalty upon him. At the end of this trial, appellant was again found guilty of murder in the first degree but the jury

spared his life and fixed his sentence at life imprisonment.

The case reaches us on appeal involving a voluminous record, the printed volume of argument on behalf of appellant comprising 263 pages. Appellant requested, and was granted, the privilege of arguing the case orally prior to submission.

On appeal appellant urges twelve points:

1. Suppression of evidence.
2. The order requiring defendant's counsel to file the report of its ballistics expert.
3. Denial of motion to disqualify the trial court.
4. Prejudicial comments of the court during the conduct of the trial.
5. Prejudicial comments of the court to the jury.
6. Permitting the State to read into evidence the transcript of previous testimony of Linda Ford and Mary Louise Roberts.
7. Denying defendant's motion to quash the regular, alternate and special jury panels.
8. Refusal of the court to admit defendant's hospital records into evidence.
9. Denial of defendant's petition for a change of venue.
10. Contentions as to error in instructions given or refused by the court.
11. Refusal of the court to instruct the jury on manslaughter.
12. Refusal of the court to reduce the charge against appellant from first degree murder to second degree murder.

We discuss appellant's points in the order in which they have been enumerated.

*Point No. 1—Suppression of evidence.*

Appellant complains that evidence was introduced by the State in the second trial which was available but

not used and offered in the first trial. Our review is solely limited to what transpired in the second trial. In the second trial, the State handed over to appellant all of its tangible evidence for examination, photographs, etc. The record simply does not support the contention by appellant that the State suppressed any evidence.

We conclude therefore that this contention is without merit.

*Point No. 2—The order requiring defendant's counsel to file the report of its ballistics report.*

Appellant here attempts to argue that after being permitted by order of the court to have a private examination of the guns, bullets and shells by a firearms expert of his own choice, he was entitled to suppress the report received as to the results of such tests so that same could not be made a part of the record for the information of the State. The court ordered the ballistics report filed as a part of the proceedings, but not as evidence. This was proper in every respect as the report was clearly admissible in evidence if introduced by the maker thereof.

Ark. Stat. Ann. § 43-2010 (Repl. 1964) constitutes a part of our criminal procedures and it provides:

"The court, on motion of either party, may, by its order and process, compel the production of any written document, or any other thing which may be necessary or proper to be produced or exhibited as evidence on trial, and may punish a disobedience of its orders or process as in case of witness refusing to testify."

We therefore find no merit in appellant's contention under Point No. 2.

*Point No. 3—Denial of motion to disqualify the trial court.*

Appellant has abstracted the testimony of Reverend

Ray Branscum, who testified in support of the motion to disqualify the court for bias and prejudice toward the accused, as follows:

> "I am pastor of the Markham Street Baptist Church. Several months ago I was present in Judge Kirby's office and heard him make certain statements in reference to this case. Rev. Guy Wilson, Mr. Bryant and myself came to the judge's office and made a request for permission for the Sheriff's office to bring the defendant out to my church where the ordinance of baptism might be observed. Judge Kirby said he didn't have any confidence in James' profession and that he had killed a man but he was going to grant the request. He told the deputy sheriff that he wanted him heavily guarded and if James made a move, to shoot him down because he didn't want him brought back to him because he intended to burn the s.o.b. anyway."

Reverend Guy S. Wilson testified substantially to the same facts as set forth by Reverend Branscum.

The court took a calculated risk in order to accommodate the ministers and appellant.

At the conclusion of the hearing, the court overruled the motion to disqualify, stating:

> "I think I can give him a fair trial, and I have nothing to do with punishing him, certainly. It is up to the jury to do that. If I don't give him a fair trial, the Supreme Court can reverse me. They have reversed me once before when I thought I was right. I don't think my personal feelings have anything to do with it one way or the other. I did make the statement that if he ran to shoot him. I remember that. I don't remember saying that I was going to burn him, because that's silly; I can't burn him."

The fact that a trial judge may have, or develop during a trial, a personal opinion as to the merits of the case does not make the trial court so biased and prejudiced as to require his disqualification in further proceedings. The mischief occurs when the trial court communicates to the jury by word or deed a personal bias, prejudice or animus toward the accused, causing the accused to be denied a fair and impartial trial. Of course, statements made by a trial court long before a jury panel is selected, and in no way communicated to the trial jury, would not constitute any such bias or prejudice in the conduct of the trial. Since the court actually proceeded to try this case, we review the record in the light of what actually transpired.

The trial court gave counsel for appellant some seven months to prepare for this case. The trial court granted appellant's motion to take him from the State Penitentiary and place him in the Pulaski County Jail, for the convenience of his counsel in preparing appellant's defense; and the court promptly granted appellant's sweeping motion for production and private examination of all the tangible objects which were to be introduced by the State in evidence. When the ministers called upon the court requesting that the accused, a man previously convicted of murder in the first degree, be released from jail to go to a local church for baptism, the court acceded to the request but instructed the deputy sheriff to shoot appellant if he attempted to escape. Moreover, at the conclusion of his second trial, appellant, instead of receiving the death sentence upon conviction, was given a sentence of life imprisonment.

We have concluded that the trial court acted properly, and even generously, toward appellant in the course of the second trial and that the court exhibited no personal bias or prejudice to the jury. A jury inflamed against the accused would hardly have convicted him of murder in the first degree and then spared his life by imposing a sentence of life imprisonment.

It is an established rule of law that while a trial

judge may have an opinion as to the merits of the case on trial, this does not make him biased or prejudiced as to the conduct of the trial. When challenged for bias and prejudice, it is for the trial court to search his conscience and decide whether to recuse himself from the case. We find from the record in this case that the trial court conducted the trial in an exemplary manner and without any bias or prejudice toward the accused.

In an early Arkansas case, *Jones* v. *State,* 61 Ark. 88 32 S. W. 81 (1895), we said:

"* * * If having formed an opinion as to the guilt or innocence of a defendant on trial in a criminal case was a disqualification of a judge presiding at the trial, it would often be a difficult matter to find a judge that would not be disqualified. * * *"

See also *Reaves and Neal* v. *State,* 229 Ark. 453, 316 S. W. 2d 824 (Repl. 1958); *State* v. *Flynn,* 31 Ark. 35 (1896), and 48 C.J.S., *Judges,* § 82 at p. 1,061, from which we quote:

"* * * A judge is not disqualified by having known defendant in a criminal trial or by having sat in trials of defendant on previous occasions. The fact that a judge is prejudiced against the commission of a crime does not disqualify him from presiding at the trial thereof. He is not necessarily disqualified because he has formed an opinion as to the legal questions involved in the case or as to the guilt or innocence of an accused who is brought before him; nor is he disqualified because of unfavorable comments or an expression of opinion as to the guilt or innocence of such accused. * * *"

The language quoted above applies only to those opinions of the court expressed out of the presence of the jury trying the case, which is the exact situation in relation to the comments of the trial court in this case.

Our trial judges are forbidden from commenting

on the evidence to the jury. § 23, Article VII, Constitution of Arkansas (1874).

We therefore find no merit in appellant's contentions under Point No. 3.

*Point No. 4—Prejudicial comments of the court during conduct of the trial.*

We have examined the record in this case as to all comments of the trial court made in the presence of the jury and we find no prejudicial error in any of said comments.

We therefore find no merit in appellant's contentions under Point No. 4.

*Point No. 5—Prejudicial comments of the court to the jury, prior to trial.*

When the jury panel was sworn to answer questions put to them as to their qualifications, the court made the following comments:

"By way of explanation, I might say to the jury that this is the second time this case has been tried, or will be the second time. Mr. Walker was tried once and convicted and the Supreme Court reversed it and sent it back here for retrial."

The court granted counsel for appellant wide latitude throughout the voir dire examination of the jurors. This examination continued for more than one day. On the second day, two additional jurors reported and for their benefit the court made the following explanatory statement:

"I might mention, by way of explanation, that Mr. Walker was tried previously, convicted, and the Supreme Court reversed the case and sent it back for a new trial."

Counsel for appellant in the course of this trial cross-examined the prosecuting witnesses at great length upon the testimony they had given in the first trial of appellant, in an effort to impeach their testimony. Throughout the taking of evidence, the fact that appellant had been tried before on the same charge was kept before the jury by counsel for appellant. Appellant is, therefore, in no position to complain because of the explanatory statements of fact made by the court.

Furthermore, when the trial court explained to the jury panel, before the trial jury was selected from the panel, that the previous conviction of appellant had been reversed by this court, necessitating a new trial, the implications of these remarks, if any, could be construed as favorable to the accused.

In *Stanley* v. *State,* 174 Ark. 743, 297 S. W. 826 (1927), it was held that it was not error for the prosecuting attorney in his opening statement to tell the actual trial jury of a previous conviction and reversal by the Supreme Court. In *Ford* v. *State,* 222 Ark. 16, 257 S. W. 2d (1953), a far longer statement by the lower court to the effect that the defendant had been tried and convicted for the same crime previously was held not to be error. See also *Youngblood* v. *State,* 161 Ark. 144, 255 S. W. 572 (1924), cited by appellant. There, it was said that the purpose of the statute, Ark. Stat. Ann. § 43-2205 (Repl. 1964), was to prevent a former conviction from being used in evidence or argument. In the present case, the fact that Walker had been tried and convicted was not offered in evidence nor was it argued.

We therefore find no merit in appellant's contentions under Point No. 5.

*Point No. 6—Permitting the State to read into evidence the transcript of previous testimony of Linda Ford and Mary Louise Roberts.*

We agree with appellant that the testimony of Linda

Ford in particular, the eyewitness to the shooting, was extremely material to the State's case. We also agree with the trial court that it was necessary to produce her and have her present at the trial if she could be located, picked up and held as a material witness.

Ark. Stat. Ann. § 28-713 (Repl. 1962) provides as follows:

"Admissibility of testimony at prior trial.—On the trial of any cause, civil or criminal, the properly authenticated transcript of the testimony of any witness, or other evidence of the testimony of any witness when properly proved, which testimony was given in any court at any former trial or examination of the same cause between the same parties or their privies, may be read or admitted in evidence, when the former witness is dead, beyond the jurisdiction of the court, has become insane since the former trial or examination, or when for any reason the former witness may not be available, and also in all cases in which for any reason a former witness refuses to testify concerning the matters as to which he formerly testified. But no such transcript of testimony, nor proof of such testimony, may be admitted on behalf of either party in a criminal case unless it is first shown that the party against whom it is sought to be used was present, in person or by attorney, at the former trial or examination and there had the opportunity to examine or cross-examine the witness whose testimony is offered in evidence. [Init. Meas. 1936, No. 3 § 14; Acts 1937, § 14 p. 1384; Pope's Dig., § 3916."]

Chief of Police Ray Vick of the North Little Rock Police Department, and Chief of Police R. E. Brians of the Little Rock Police Department, testified that several weeks before appellant's trial they had issued general pickup instructions as to these witnesses, including their names, clubs frequented, etc.

Deputy Sheriff Dennis L. Jones testified concerning his sustained effort to find the witnesses in advance of the trial.

We quote from appellant's abstract of the testimony of Deputy Sheriff Jones:

"I am a deputy sheriff. I attempted to locate Linda Ford in reference to a subpoena. I called the police chief at Lake Village. I was later informed she was living at 1800 Scott St., Little Rock. I attempted to find her mother, who formerly lived with her at 1102½ Main St., Little Rock, and was advised she no longer lived there. I learned today where her mother is supposed to be living and went there and found no one at home in this big rooming house. I rang the bell and looked in the windows but was able to raise no one. I asked for the assistance of the North Little Rock Police Department and the Little Rock Police Department. The last time Mary Roberts was seen in North Little Rock was some two or three weeks before the subpoena was issued. She was on the Wonder Grill lot in North Little Rock. Further information indicated she visited Barbara somebody who lives at 402 E. 12th St., North Little Rock. I made repeated trips by the Wonder Grill and by 402 E. 12th St. attempting to locate her automobile with negative results. Mary Roberts previously gave the address of 2209 McAlmont, which was her sister, Hazel Powell's address. Investigation revealed that Hazel Powell did not live at that address any longer."

It will be recalled that at the very beginning of the trial, all witnesses were required to come forward to be sworn. Linda Ford and Mary Louise Roberts did not appear to be sworn. There was, therefore, no element of surprise to appellant when the State sought during the progress of the trial to offer their testimony as given at the previous trial. We have concluded that an adequate foundation was laid for the introduction of

this previous testimony, and that the trial court did not abuse its discretion in permitting same to be received and to go to the jury.

At the first trial, Linda Ford testified in person and appellant was convicted and received the death sentence. It is generally recognized that the reading of previous testimony of a witness not present' in the courtroom is not as effective as having the witness on the stand. It may well be that the inability of the State to produce these witnesses for the second trial had a part in the ultimate lesser sentence of appellant to life imprisonment. Cases of interest on this point include the following:

*Mode* v. *State,* 234 Ark. 46, 350 S. W. 2d 675 (1961) ; *Smith* v. *State,* 222 Ark. 585, 261 S. W. 2d 788 (1953) ; *Marks* v. *State,* 192 Ark. 881, 95 S. W. 2d 634 (1936) ; *Adams* v. *State,* 176 Ark. 916, 5 S. W. 2d 946 (1928), and *Edwards* v. *State,* 171 Ark. 778, 286 S. W. 935 (1926).

We therefore find no merit in appellant's contentions under Point No. 6.

*Point No. 7—Denying defendant's motion to quash the regular, alternate and special jury panels.*

Appellant contends that the petit and grand jury panels should have been quashed because they were not selected from a list of qualified electors as required by Ark. Stat. Ann. § 39-208 (Repl. 1962).

Prior to January 1, 1965, a citizen of Arkansas had to possess a current poll tax receipt in order to be a qualified elector. Amendment 51 of the Arkansas Constitution was adopted at the general election of November 3, 1964 and superseded this requirement. It provided a new and permanent system of voter registration in order for a citizen to become a qualified elector. After Amendment 51 became effective the legislature recogniz-

ing the interim period of uncertainty as to the qualified electors pending the accomplishment of sufficient registration of voters to comprise lists of same from which adequate jury panels could be selected, passed Act 126 of 1965 to meet the situation, and we quote the preamble and portions of said act:

"Whereas, it now appears unlikely that the qualified individuals in Arkansas may be registered under Amendment 51 prior to March 1, 1965, and there will be an interim time from March 1, 1965 until later in the year when voter registration is an accomplished fact.

"Section I—All other persons who otherwise possess the qualifications of a grand or petit juror as now provided by the statutes of Arkansas and who have paid a poll tax between October 1, 1963 and October 1, 1965 are hereby declared to be an eligible grand or petit juror.

"Section II—This Act shall be in full force and effect from March 1, 1965 to October 1, 1965."

The record reflects that the jury panels in this case were selected nearly two months before November 3, 1965, when the hearing on the motion to quash was heard. This necessarily made Act 126 of 1965 squarely applicable to the situation at hand. See *Coger* v. *City of Fayetteville,* 239 Ark. 688, 393 S. W. 2d 622 (1965); *Harris* v. *State,* 239 Ark. 771, 394 S. W. 2d 135 (1965), and also *Tiner* v. *State,* 239 Ark. 819, 394 S. W. 2d 608 (1965).

We therefore find no error in the denial of appellant's motion to quash the jury panels. We also find no abuse of discretion by the trial court in refusing to disqualify the jury commissioners, or as to any other alleged irregularity in the selection of the trial jury.

We therefore find no merit in appellant's contentions under Point No. 7.

*Point No. 8—Refusal of the court to admit defendant's hospital records into evidence.*

Appellant contends that it was error for the court to withdraw appellant's hospital record after it had been properly admitted in accordance with Ark. Stat. Ann. § 28-928 and Ark. Stat. Ann. § 28-932 (Repl. 1962).

We agree with appellant in that the hospital record was properly admitted and should have been permitted to be read to the jury by the Chief Medical Records Librarian. The librarian as custodian of the medical records could not properly testify as to her opinion or interpretation of records which she held as custodian but did not personally make. The purpose of Ark. Stat. Ann. § 28-928 is to overcome the old rule that such written reports are hearsay and therefore such records are admissible if properly established as being made in the regular course of the hospital's business procedures. However, during the trial, Dr. Robert M. Stainton, the doctor who had prepared the hospital report in question, was called as a witness and at that time it was admitted into evidence and read into the record by Dr. Stainton. Any error was thus completely cured.

We therefore find no merit in appellant's contentions under Point No. 8.

*Point No. 9—Denial of defendant's petition for a change of venue.*

Ark. Stat. Ann. § 43-1501 (Repl. 1964) states:

"Prejudice. Any criminal cause pending in any circuit court may be removed by the order of such court, or by the judge thereof in vacation, to the circuit court of another county, whenever it shall appear, in the manner hereinafter provided, that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein. [Crim. Code, § 414 (as added by Act

Apr. 25, 1873, No. 98, § 1 p. 234; C. and M. Dig., § 3087; Pope's Dig., § 3917.]"

The rule as to a change of venue has been frequently examined and is well established. As stated in *Perry* v. *State*, 232 Ark. 959, 342 S. W. 2d 95 (1960), the trial court has wide discretion in passing upon a petition for change of venue and unless it appears that the court has abused that discretion, this court will not reverse. See also *Lauderdale* v. *State*, 233 Ark. 96, 343 S. W. 2d 422 (1961).

The newspaper articles that gave wide publicity to appellant's case were published either before or just after appellant's first trial in 1963, almost two years before the instant trial was held, with the exception of one editorial in the Arkansas Gazette published on May 12, 1965. We have concluded that the impact of the editorial coincided with the general distribution of the Gazette, which is statewide. While we do not approve of some of the inflamatory language in this editorial, we believe its adverse effect, if any, as to appellant had been dissipated at the time of trial.

Furthermore, appellant's counsel, during voir dire, thoroughly examined the jurors on this subject and all jurors who were accepted stated that they could give appellant a fair hearing and verdict, free of any influence by the editorial.

It appears, therefore, that there was ample support in the record for the decision of the trial court to deny the motion for a change of venue. We find no abuse of discretion by the trial court as to this issue.

We therefore find no merit in appellant's contentions under Point No. 9.

*Point No. 10—Contentions as to error in instructions given or refused by the court.*

We have examined all of the instructions given by

the court to the jury. We find no error in the instructions. We have likewise examined the instructions requested by appellant which the court declined to give. All of such instructions were either fully covered by other instructions actually given or refused as erroneous under law.

We therefore find no merit in appellant's contentions under Point No. 10.

*Point No. 11—Refusal of the court to instruct the jury on manslaughter.*

The court refused to grant appellant's request for an instruction on manslaughter, and this ruling is assigned as error. The same circumstances were presented to this court in *Outler v. State,* 154 Ark. 598, 243 S. W. 851 (1922), where it was said: ''At any rate, the verdict of the jury under this instruction (of first degree and second degree murder) necessarily implied a finding that the killing was not done under circumstances which would reduce the degree of the offense to manslaughter, and no prejudice resulted from the failure of the court to instruct on the subject of manslaughter.'' See *Newsome v. State,* 214 Ark. 48, 214 S. W. 2d 778 (1948), and also *Talley v. State,* 236 Ark. 911, 370 S. W. 2d 604 (1963), where again the refusal to instruct on manslaughter was considered harmless error in view of the fact that the appellant was found guilty of first or second degree murder.

We therefore find no merit in appellant's contentions under Point No. 11.

*Point No. 12—Refusal of the court to reduce the charge against appellant from first degree murder to second degree murder.*

At the conclusion of the State's case, the appellant moved for a reduction of the charge from first degree murder to second degree murder and also later requested

a similar instruction to the jury, both of which were refused by the court.

As discussed under Point No. 11, the instructions as given to the jury authorized the jury to bring in a verdict of second degree murder or a verdict of murder in the first degree.

Linda Ford, a passenger in the car of appellant, testified that appellant fired first at Officer Vaughn. The cab driver on the scene testified that he heard shots being fired before observing Officer Vaughn draw his pistol. Appellant must have known from the flashing dome light of the Barrentine police car that his car was being stopped for a police check.

Appellant had no known reason to fear for his personal safety when his car was caused to slow down and pull over and stop by the police car behind it. Appellant opened the car door with a drawn gun in his hand and started the shooting with deadly accuracy. There is no suggestion in this record that he did not act of his own volition and with deliberation. The evidence in the case was certainly sufficient to authorize the jury in finding that appellant killed Officer Vaughn with deliberation, premeditation and malice aforethought.

The necessary elements of deliberation and premeditation in the offense of murder in the first degree may be inferred from the factual circumstances as shown by the evidence, where those circumstances clearly warrant the jury in such an inference or conclusion. In this case, the circumstances as reflected by the evidence are inconsistent with any other hypothesis than that of murder in the first degree. *House* v. *State,* 230 Ark. 622, 324 S. W. 2d 112 (1959), and *Weldon* v. *State,* 168 Ark. 534, 270 S. W. 968 (1925).

We therefore find no merit in appellant's contentions under Point No. 12.

Having found no merit in any of the points urged by appellant, the judgment of the trial court is affirmed.

Affirmed.

See Per Curiam order and dissent, page 663.