**James Dean WALKER, Appellant,**

v.

**A.L. LOCKHART, Superintendent of the Arkansas Department of Corrections, Appellee.**

**No. 81–1700 (Civil Rights).**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 18, 1981.

Decided Aug. 11, 1983.

Rehearing En Banc Denied Oct. 4, 1983.

Bill W. Bristow, Seay & Bristow, Jonesboro, Ark., Oscar Fendler, Blytheville, Ark., Paul Halvonik, Halvonik & Halvonik, Berkeley, Cal., for appellant.

Thomas M. Carpenter, Lessenberry & Carpenter, Little Rock, Ark., for American Civil Liberties Union.

Steve Clark, Atty. Gen. by Theodore Holder, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

James Dean Walker, an inmate in the Arkansas prison system, brings this action

under 42 U.S.C. § 1983, alleging that his continued confinement in the Arkansas prison systems amounts to cruel and unusual punishment in violation of the eighth and fourteenth amendments. Walker petitions this court to enter an appropriate order for his protection and he suggests that this court order the Arkansas authorities to transfer him either to another state's prison system or to the federal prison system. The district court granted interim relief pending disposition of this complaint, as well as a simultaneous petition for habeas corpus. After a full evidentiary hearing, the district court denied all of Walker's requests for relief and Walker appealed.[1] Subsequently, this court entered a protective order directing the Arkansas authorities to take certain specified steps to protect Walker during the pendency of this appeal. *Walker v. Lockhart,* 678 F.2d 68 (8th Cir.1982). Having reviewed the record, we vacate the judgment of the district court and remand this case with directions to grant Walker's requested relief on his civil rights claim under 42 U.S.C. § 1983.

## I. *Procedural Background.*

James Dean Walker is serving a life sentence for the fatal shooting of a North Little Rock, Arkansas, policeman in 1963. James Dean Walker's sojourn through the judicial system began in 1964 when a jury found Walker guilty of murdering a North Little Rock policeman and sentenced Walker to death. On appeal, the Arkansas Supreme Court reversed the conviction and remanded the cause for a new trial. *Walker v. State,* 239 Ark. 172, 388 S.W.2d 13 (1965). At the second trial a jury again found Walker guilty but sentenced him to life imprisonment. Walker's second appeal to the Arkansas Supreme Court was unsuc-

cessful. *Walker v. State,* 241 Ark. 300, 408 S.W.2d 905 (1966), rehearing denied, 408 S.W.2d 917 (Ark.1966) (two justices dissenting), and the Supreme Court denied certiorari. *Walker v. Arkansas,* 386 U.S. 682, 87 S.Ct. 1325, 18 L.Ed.2d 403 (1967). Thereafter, Walker filed a petition for habeas corpus in the United States District Court for the Eastern District of Arkansas. After conducting an evidentiary hearing, the district court denied Walker's petition. *Walker v. Bishop,* 295 F.Supp. 767 (E.D.Ark.1967). On appeal this court affirmed. *Walker v. Bishop,* 408 F.2d 1378 (8th Cir.1969).

From the beginning of his incarceration until March of 1975, Walker was a model prisoner. During this period, Walker apparently experienced a religious rebirth; while incarcerated, Walker participated in several charitable and religious projects. The Arkansas Board of Corrections even permitted Walker to leave prison on dozens of furloughs so that he could give speeches and do other charitable and religious work around the state.

In March of 1975, Walker failed to return from an overnight furlough. Approximately four and one-half years later, California law enforcement authorities apprehended Walker. The State of Arkansas began extradition proceedings, but Walker filed motions to block extradition in both the federal and California courts. Walker contended that the Arkansas prison system was not operating in compliance with the eighth amendment and that if he returned to Arkansas he would be in grave danger. On April 9, 1980, the California Supreme Court issued a writ of habeas corpus, directing the Superior Court of El Dorado County to hold an evidentiary hearing on Walker's contentions. *In re Walker on Habeas Corpus,*

---

1. Walker appealed both from the district court's dismissal of his section 1983 claim and from the court's dismissal of his habeas claim. Following oral argument before this panel, the court, on this panel's recommendation, referred the case to the court *en banc.* Subsequently, the court *en banc* directed this panel to decide Walker's section 1983 claim. In effect, the court *en banc* bifurcated Walker's appeal. The

court *en banc* heard oral argument on Walker's habeas claims on September 15, 1982. For administrative clarity the court has designated Walker's section 1983 claim as No. 81–1700 (Civil Rights) and his habeas claim as No. 81–1700 (Habeas). This panel has determined that it is appropriate to file this opinion even though the court *en banc* has yet to file its decision regarding Walker's habeas claim.

Crim. No. 21422 (Cal. Apr. 9, 1980). Justice Rehnquist, acting as Circuit Justice, stayed the California Supreme Court's order pending consideration by the full United States Supreme Court. *Pacileo v. Walker,* 446 U.S. 1307, 100 S.Ct. 1633, 64 L.Ed.2d 221 (1980) (Rehnquist, Circuit Justice). The Supreme Court reversed the California Supreme Court in *Pacileo v. Walker,* 449 U.S. 86, 101 S.Ct. 308, 66 L.Ed.2d 304 (1980) (per curiam), and Walker returned to Arkansas.

Upon his return, Walker brought suit against several individuals, including A.L. Lockhart,[2] the Superintendent of the Arkansas Department of Corrections. Walker's suit combined a claim under 42 U.S.C. § 1983 with a writ of habeas corpus. In his section 1983 claim Walker contended that his confinement within the Arkansas penal system violated the eighth amendment prohibition against cruel and unusual punishment. Specifically, Walker alleged that as a result of threats made against his life by Lockhart, his life will be in danger if he returns to the general prison population in Arkansas. Walker requested an order directing that he serve the remainder of his sentence outside the Arkansas prison system, in either a federal penitentiary or a prison in another state. Following an expedited hearing solely on the issue of Walker's immediate safety, the district court ordered that Walker remain at the prison system's intake facility, the Pine Bluff Diagnostic Unit (Pine Bluff), until the court ruled on the merits of Walker's claims. Walker had voluntarily been in what is, essentially, solitary confinement at Pine Bluff since his return from California.

After a hearing on the merits of Walker's claims, the district court dismissed both Walker's section 1983 claim and his petition for a writ of habeas corpus. *Walker v. Lockhart,* 514 F.Supp. 1347 (E.D.Ark.1981).

Although the district court made no findings of fact relating to Lockhart's alleged threats against Walker, the court stated that the "white light of publicity" surrounding Walker's case ensured that Walker would be safer in the Arkansas prison system than in any other prison system. The district court left the matter of Walker's safety to the discretion of the Arkansas prison officials. Walker appealed. Thereafter, the Arkansas authorities began implementing their plan to phase Walker back into the general prison population. On May 4, 1982, this court, at Walker's request, entered a protective order directing that Walker's condition be maintained at Pine Bluff exactly as it had been prior to the district court's dismissal of Walker's claims.[3] *Walker v. Lockhart, supra,* 678 F.2d at 71. We turn now to the factual background of Walker's section 1983 allegation.

## II. *Factual Background.*

Inasmuch as the district court made no findings of fact on the key issue relating to Lockhart's alleged threats against Walker, we think it necessary to summarize the testimony on this point.

### A. *Walker's Evidence of Threats.*

Walker testified that five or six weeks after prison authorities transferred him from the Tucker Unit to the Cummins Unit in 1974, Lockhart, then the warden at Cummins, threatened to kill him. This alleged incident arose in connection with Walker's prison job. Walker worked in the prison meatpacking facility and his job included keeping records of all disbursements of meat and other foods.

Walker stated the incident began with a phone call from an unidentified caller, telling Walker that "Johnny Robinson wishes

---

**2.** All of the other named individuals were later dismissed from the suit.

**3.** Subsequently, Walker filed another petition for a protective order, contending the Arkansas authorities had failed to comply with this

court's May 4, 1982 order. On March 10, 1983, we reiterated our May 4 order and took Walker's specific allegations under advisement. Our disposition today of Walker's section 1983 claim renders these claims moot.

to draw two pounds of ground beef, half a pound of cheese, and a half a pound of sliced bologna." Walker asked the caller who Johnny Robinson was and the caller responded, "It's Mr. Lockhart's houseboy, goddamn it." Walker testified that ten minutes later Major Henderson and Lieutenant Norris came into the work area, handcuffed Walker, and took him to Lockhart's office. In addition to Lockhart, Walker stated Majors Henderson and Hawke were also in Lockhart's office. Walker described the meeting:

I was brought in and Mr. Lockhart was sitting at his desk, looking at me. He asked me what the hell I thought I was doing, refusing the meat order. And I started to explain my position, that I had been told not to fill meat orders; at this point he became enraged. He says: "I don't give a goddamn who told you what." He says, "Let me tell you right now", he said, "I am running this prison, goddamn it, not you, not anyone else." He said, "Do you understand me, you sorry son of a bitch", he said, "You're not at the Tucker unit now. You're over here. You belong to me now."

He said, "What the hell business you think you have", he said—I said, "Sir"—I tried to explain my position. I said I was doing the best job I had been told how to do. He said, "You're best is not good enough". He said, "Let me tell you, you sorry son of a bitch", he said, "I'll bury you out there in that goddamn field." He said, "Do you understand me?" I said, "Yes, sir, I do."

He said, "You understand me? Do you understand what I am saying to you", he said, "You're not at the Cummins unit—Tucker unit any more. You're over here now", and he said, "I'll have you killed you sorry son of a bitch. Do you believe me?" I said, "Yes, sir, I do."

He said, "Do you believe me?" Again, he asked me.

I said, "Yes."

Walker stated that this meeting continued in the same vein for several minutes until Lockhart told Major Henderson to take Walker back to the meatpacking plant and that if he gave anyone trouble, "Bring him back to me in a sack." Walker testified that there was no doubt in his mind that Lockhart meant exactly what he had said and that if he were returned to the general population at Cummins, Lockhart "could arrange for my physical harm or outright death at any time * * * he wished to."

Bill Baker, a long-time civilian friend of Walker's, corroborated the basics of Walker's testimony. On his last furlough from Cummins, Walker visited Baker and his family. Baker testified that on Walker's last day of his furlough he seemed frightened and unusually uneasy. Baker had asked Walker why he was so preoccupied and Walker said that Lockhart had threatened his life.

Charlie Branch, a former inmate in the Arkansas prison system, testified that in 1974 Lockhart told him that if he wanted a furlough to see his wife and child he should kill Walker. Branch stated that Lockhart went so far as to explain how he might go about committing the crime. Another former inmate, Bill Thompson, testified that in 1972 or 1973, while both he and Walker were incarcerated at the Tucker Unit, he overheard Lockhart discussing Walker with the warden at Tucker. According to Thompson, Lockhart told Tucker's warden, "Send the copkilling son of a bitch to Cummins, I know what to do with him."

Cecil Boren, presently employed at the Federal Correctional Institution at Texarkana, Arkansas, and formerly the assistant superintendent at Cummins, testified under subpoena as a witness for Walker. Boren testified that while he was at Cummins he had personally heard Lockhart make threatening statements about Walker. Specifically, Boren stated, "I recall an instance where Mr. Lockhart stated that if Walker ever run off or ever gave us any trouble, that he was going to see that he got—that he would be killed or eliminated." Boren also stated that Lockhart was a very serious man who did not make idle threats. Moreover, Boren

stated that he had heard Lockhart make numerous threats against other prisoners.

## B. *The State's Evidence with Regard to Threats.*

Lockhart's testimony contradicted much of Walker's and Boren's testimony. Lockhart categorically denied ever threatening Walker. He testified that he never told Boren or anyone else that he would like to see Walker harmed. Moreover, Lockhart stated that he could not recall ever having a conversation in his office with Walker and that he had not known of any problems between Walker and inmate Johnny Robinson. Lockhart also pointed out that it was he who had recommended Walker for his last furlough.

Michael Hawke corroborated Lockhart's testimony. Hawke testified that he had never been present at a conversation between Lockhart and Walker, and denied any knowledge of the threats outlined by Walker. He stated that he had never heard Lockhart threaten any prisoner.

The State presented evidence in an attempt to impeach the credibility of Cecil Boren. Jerry Campbell, warden at the Tucker Unit, and Terrell Hutto, former Commissioner of the Arkansas Department of Corrections and presently Director of the Virginia Department of Corrections, both testified Boren had wanted Lockhart's job as warden at Cummins. They testified that Boren held a lot of animosity against Lockhart. On cross-examination, Walker's attorneys attempted to discredit Campbell's testimony by bringing out the fact that Lockhart had not taken disciplinary action against Campbell for an alleged instance of brutality at the Tucker Unit. Lockhart stated that he had not been in the chain of command with regard to that event.

## C. *Walker's Safety.*

Throughout the hearing, both sides elicited considerable testimony concerning the issue of James Dean Walker's safety. Cecil Boren summed up the testimony for Walker when he stated:

> In my judgment if James Dean Walker is placed back in the general population at Cummins Prison, I don't think he will make it.
>
> \* \* \* \* \* \*
>
> I think someone down there will kill him.

Boren explained his reasoning:

> [T]here's many inmates at Cummins Prison right now [that are] serving life sentences without ever hope of parole, and if they have a vendetta against Mr. Lockhart, or any other official down there, they could knock James Dean Walker off to get back at the administration.

Dr. Robert Powitzky, assistant director in charge of Health and Correctional Programs for the Arkansas Department of Corrections, appearing as a State's witness, testified that there were no plans to place Walker back at Cummins. Dr. Powitzky stated that the Department of Corrections planned to keep Walker housed at Pine Bluff and to phase him gradually out of administrative segregation and back into general prison life. Dr. Powitzky stated that he thought Walker would be safe under this plan. Other Arkansas officials testified that they thought that they could keep Walker safe. Terrell Hutto stated that "Mr. Walker is as safe \* \* \* [at Pine Bluff] as Mr. Walker would be in any prison system in the country."

Dr. Powitzky also testified that there is a substantial likelihood that an inmate with a personal vendetta against Lockhart might try to harm Walker to make Lockhart look bad. Dr. Powitzky stated that this problem would continue into the foreseeable future. Dr. Powitzky stated that on occasion inmates are permanently transferred from Cummins to Pine Bluff to relieve overcrowded conditions at Cummins, and that this would, in fact, pose a threat to Walker if any of the transferred inmates had access to him.

The district court, specifically crediting the testimony of Terrell Hutto, found that

the Arkansas Penitentiary would be the safest place for Walker to be incarcerated. As previously noted, the district court did not make any findings on whether Lockhart did, in fact, threaten Walker.

III. *Discussion.*

We, of course, will not undertake to determine whether Lockhart, in fact, threatened Walker's life. After reviewing the record, however, we are in a position to conclude that there exists substantial, uncontradicted evidence to indicate that any reasonable person in Walker's position would have ample reason to fear for his safety above that fear experienced by the ordinary inmate incarcerated in the Arkansas penal system. The evidence indicates that Walker faces increased danger in the Arkansas prison system if he is allowed to mix with the system's general population. ·

Walker's notoriety and his present claim that Lockhart has threatened him, makes Walker an inviting target for any disgruntled prisoner who wants to embarrass the prison authorities. In making this statement, we emphasize that we do not find that Lockhart ever made any threats against Walker, or that he has any present intention of harming Walker. However, in light of the statements by Dr. Powitzky and by Lockhart himself conceding that Walker faces an increased risk of danger in the Arkansas prison system, we conclude that Walker should be transferred to another prison system. The expressions of opinion by the Arkansas authorities cannot be discounted or dismissed.

Walker remains in virtual solitary confinement at the Pine Bluff Unit. Walker is entitled to the same privileges and amenities as any other prisoner in the institution. In other words, Walker cannot be kept in solitary confinement forever. Walker must be allowed to receive visitors, he should have the right to daily showers, to daily exercise, and to other privileges enjoyed by other prisoners in an institution. Walker is entitled to contact with other prisoners and it is the obligation of the prison authorities to ensure that Walker is protected. In addition, Walker should be required to perform such prison duties as are appropriate; he should not be kept in idleness.

We recognize that the administration of prisons is generally not within the province of the courts. Here, however, the undisputed evidence demonstrates that Walker's continued confinement in the Arkansas prison system will subject him to an unusually high risk of physical danger. This is unacceptable. We do not intend by our remarks to demean the efforts of the prison authorities to integrate Walker back into the general prison population; however, it is extremely unlikely that these efforts can ever sufficiently negate the risk to Walker's safety. In light of the special factors present in this case, we conclude that the interests of James Dean Walker as well as the Arkansas prison system, would be best protected if Walker served out the remainder of his sentence in another jurisdiction. We do not agree with the district court that the "white light of publicity" will ensure Walker's safety. It is a truism that today's headlines are soon forgotten. Here there is no evidence in the record to show that Walker's notoriety will keep him safe; there is ample evidence to the contrary.

We hold that Walker's life is put in danger by his incarceration in the Arkansas general prison population and that Walker has established the right to serve the remainder of his sentence in an institution outside of Arkansas where he will have the same privileges and obligations as other prisoners, but without facing undue risks and fears for his safety. Accordingly, we reverse the judgment of the district court denying Walker's section 1983 claim. We remand this case to the district court for entry of an order in conformity with this opinion directing A.L. Lockhart to arrange without undue delay for the transfer of James Dean Walker to a place of incarceration outside of Arkansas, either in a federal or another state's correctional institution.[4]

---

4. On June 27, 1983, the court received a petition from Walker's attorneys styled "Petition for Independent Medical Inquiry." Walker's counsel contended that Walker's two years in

ROSS, Circuit Judge, dissenting.

I dissent.

I disagree with the majority's opinion for the reasons set forth by the trial judge.

solitary confinement may have adversely affected Walker's physical and mental health. This panel referred the petition to the district court directing it to order an appropriate medical examination of Walker without expense to the public and to enter any such further orders as it deems appropriate. We also directed the district court to certify to this court all of the records pertaining to Walker's examination and any related district court proceedings. *See*

*Walker v. Lockhart,* No. 81–1700 (8th Cir. July 19, 1983) (unpublished order). If, by the time this court issues its mandate in this case, the district court has not yet certified these records to this court, we relinquish our jurisdiction over Walker's supplementary petition and either party aggrieved by the district court's final order may seek appellate review in the normal manner.