HORN v. COLE, ADMINISTRATOR.

4-6532                                    156 S. W. 2d 787

Opinion delivered December 15, 1941.

362

*Fred A. Snodgress,* for appellant.

*Blake Downie* and *Thomas E. Downie,* for appellee.

GREENHAW, J. Fred Horn, colored, was shot and killed by his wife, Sarah Horn, in Saline county, Arkansas, on August 9, 1940. They had been married about two years. At the time of the marriage, each of them had children by previous marriages. The deceased was the fourth husband of Sarah Horn.

At the time of his death, the deceased was and had been for some time employed by Republic Mining & Manufacturing Company of Bauxite, Arkansas. On

April 18, 1939, while so employed, a certificate of insurance in the sum of $1,000 under a group policy insuring the lives of the employees of this company was issued to Fred Horn by Lincoln National Life Insurance Company. Sarah Horn was designated as beneficiary in this certificate.

The insurance company filed a bill of interpleader in the Pulaski chancery court, admitting the execution and validity of the certificate of insurance, alleging that Sarah Horn, the beneficiary therein, and also George Cole, the administrator of the estate of Fred Horn, were claiming the proceeds of this insurance and demanding payment thereof. The bill of interpleader further alleged that the plaintiff stood ready to pay the same to whom due, and tendered with its complaint said sum of money, to be deposited in the registry of the court for the use and benefit of such of the defendants as should be adjudged entitled thereto.

The defendant administrator filed an answer, alleging that the beneficiary, Sarah Horn, had disqualified herself from receiving anything under the policy, for the reason that on August 9, 1940, she wrongfully and unlawfully killed the insured, and therefore asked that the entire proceeds of the policy be ordered paid to him as administrator of the estate. The defendant, Sarah Horn, filed an answer denying that she had disqualified herself from receiving the proceeds of the policy in question, and denied that she wrongfully and unlawfully killed the insured. She further stated that she was indicted and tried for the offense of killing her husband in the Saline circuit court, and was acquitted of said charge on September 10, 1940, and asked that the proceeds of the policy be paid to her as beneficiary.

The court released the insurance company from further liability in this matter, pursuant to the prayer in the bill of interpleader, and upon trial of the issues between the widow and administrator, found the issues in favor of the administrator. Among other things, the court found: ''That on the 9th day of August, 1940, defendant, Sarah Horn, the beneficiary, did wrongfully and unlawfully kill her husband, Fred Horn, the insured.

"And the court . . . doth order, adjudge and decree that the entire proceeds of the life insurance policy now in the registry of this court be delivered into the hands of the defendant, George Cole, administrator of the estate of Fred Horn, deceased, and that defendant, Sarah Horn, shall take no part of the proceeds of said policy, either as beneficiary or as widow of Fred Horn."

From the findings and decree of the chancery court the appellant, Sarah Horn, has appealed to this court.

The killing in this case was admitted. The appellant contends that it was done in self-defense. The testimony showed that the killing occurred some time after midnight. Marie Walters, a colored girl, in company with the son of the appellant by a former marriage, came to the home of Fred and Sarah Horn on the night of the killing, and was there at the time Sarah came in that night. She testified that when the appellant came in she was angry, and said she had seen her husband out with her cousin, Clementine Blakes, and she (Sarah) took the rifle and "pranked" with it a while. When the appellant was asked by her son what she was going to do about it, she said she was going to quit Fred, and that she went and sat on the back door steps, and in about 20 minutes Fred came up, and the appellant then said: "Fred, you just go on back where you come from. You've been dog enough to be out with my first cousin; don't come in here." Fred said it was not true—"Surely I can come to my own house," and she told him not to come, and he said he would cut her ............ ............... neck off. He kept coming, and she shot him. Fred never got inside the gate, and was about 25 or 30 feet from the steps when he was shot. She had never heard of his striking Sarah, and had not heard of their having any quarrel that night.

Fred Horn, Jr., age 13, testified that he was at home the night his father was killed. He heard the appellant's son, Buster, say to her, "What are you going to do?" and she said, "I am going to kill Fred," and Buster then said, "Mamma, don't you kill that man," and she said, "I ain't going to kill him; I am going to quit him." He further testified that she took the rifle and sat on the

door step. Presently he heard his father coming, and the appellant said, "Don't you come in this house," and his father said, "Oh, oh, woman," and she fired twice and then took the lamp and went out there to see if he was dead. He did not hear his father say he was going to cut her neck off. He also went out after his father was shot, and found him lying outside the fence. He had never known of his father and the appellant having a serious quarrel.

C. C. Perron, camp manager for the Republic Mining & Manufacturing Company at Bauxite by whom the deceased was employed testified that on the night this happened he was notified that the appellant had killed Fred Horn, whereupon he went to the camp and talked to the appellant. She said: "I killed Fred. He was out with Clementine Blakes." She said she was sitting near the door as Fred came down the hill, and she told him not to come in. Fred said he had a right to and would cut her neck off, and she shot him. Perron further testified that he never heard of the deceased striking appellant, and that they did not have a fight that day. The deceased was a very good man, while the appellant was quick tempered and would fight, and she had been married four or five times. The appellant had not gotten along with her former husbands, and he knew of quarrels she had with former husbands. The body of the deceased was lying outside the fence, about 10 feet from the gate, when he arrived.

The appellant testified that she was the beneficiary of the policy of insurance on the life of the deceased. She was tried in the Saline circuit court and found not guilty of killing him. She was forced to shoot him in self-defense. She stated that he and she started into the house and were scuffling around, and he said he was going to cut her throat. When they got to the house the gun was standing by the door, and he reached for the gun, and she also reached for it and got it and killed him. She also testified that the killing was more of an accident than self-defense. She saw the deceased with her cousin when they came around the church house, but denied telling Mr. Perron that she shot him because he had been

with her cousin. She further testified that she was not on the door step when the shooting occurred; that she was out there "tusseling" with him over the gun.

These were the only witnesses who testified concerning the circumstances of the killing. Depositions of other witnesses were introduced with reference to the characters of the appellant and the deceased.

Attorney for appellant concedes that a beneficiary in an insurance policy who wrongfully kills the insured cannot recover on the contract of insurance. He also concedes that a judgment in a criminal prosecution is not admissible in a civil action as proof of any fact except the fact of its existence.

In the case of *Washington National Insurance Company* v. *Clement,* 192 Ark. 371, 91 S. W. 2d 265, this court quoted with approval the following statements from Ruling Case Law and Corpus Juris:

"The general rule is that a judgment in a criminal prosecution is no bar to a subsequent civil action arising from the same transaction, and that the record of the criminal cause is not competent evidence in the civil action, save for the single purpose of proving its own existence, if that becomes a relevant fact, in which case not only is it admissible, but it is conclusive for the purpose of establishing the fact that it has been rendered. It cannot, however, be given in evidence in a civil action to establish the truth of the facts on which it was rendered. Hence one prosecuted and convicted of a criminal charge is not thereby estopped from maintaining a civil action and proving therein that he was innocent of the offense of which he was convicted." 15 R. C. L., p. 1000, § 476.

"By the great weight of authority, and in the absence of any statute to the contrary, a judgment or sentence in a criminal prosecution is neither a bar to a subsequent civil proceeding founded on the same facts, nor is it proof of anything in such civil proceeding, except the mere fact of its rendition." 34 C. J., p. 970, § 1387.

In the case of *Keels* v. *Atlantic Coast Line R. Co.,* 159 S. C. 520, 157 S. E. 834, the court said: "Under the

common-law rule with regard to such benefits, a beneficiary who may have been convicted of murder or voluntary manslaughter is not bound by his conviction, but the question of his guilt or innocence, when involved in a civil action to which the rule is applicable, still remains to be determined in the trial of such civil action."

In view of the fact that the Pulaski chancery court was not bound by the judgment of the Saline circuit court in a criminal case in which the appellant was acquitted of the crime of killing her husband, and had the right to determine the question of whether the appellant wrongfully and unlawfully killed her husband, upon testimony introduced in the chancery court, we are unable to say that the finding and decree of the chancery court to the effect that the appellant wrongfully and unlawfully killed her husband was against a preponderance of the evidence. It is well known, of course, that a higher degree of evidence is required in the trial of a criminal case than in a civil case. Before a jury is warranted in convicting a person in a criminal case the jurors must be convinced of the guilt of the accused beyond a reasonable doubt, whereas in a civil suit the court or jury is only required to find certain facts by a preponderance of the evidence. Neither a conviction nor an acquittal of the appellant in the criminal case would have been binding upon the court in the trial of the issues here involved.

This court has repeatedly held that where the beneficiary in a policy of life insurance wrongfully kills the insured, public policy prohibits a recovery by the beneficiary. In the case of *Metropolitan Life Insurance Company* v. *Shane*, 98 Ark. 132, 135 S. W. 836, this court said: "The wilful, unlawful and felonious killing of the assured by the person named as beneficiary in a life policy forfeits all rights of such person therein. It is unnecessary that there should be an express exception in the contract of insurance forbidding a recovery in favor of such person in such event. On considerations of public policy the death of the insured, wilfully and intentionally caused by the beneficiary of the policy, is an excepted risk so far as the person thus causing the death is concerned."

In the case of *Cooper* v. *Krisch,* 179 Ark. 952, 18 S. W. 2d 909, this court held that when the beneficiary in a life insurance policy unlawfully kills the insured, the amount of the insurance becomes an asset of the insured's estate, to be recovered by the administrator for the payment of debts and distribution to the heirs.

The appellant contends that even if she is not entitled to recover under the policy as beneficiary, she would be entitled to claim part of the proceeds of this money as dower, by virtue of being the widow of deceased. We cannot agree with this contention. The Supreme Court of the United States, in the case of *Mutual Life Insurance Company* v. *Armstrong,* 117 U. S. 591, 6 S. Ct. 877, 29 L. Ed. 997, said: "It would be a reproach to the jurisprudence of this country if one could recover insurance money payable on the death of the party whose life he had feloniously taken."

Since the appellant is not entitled to recover the insurance money as a beneficiary by reason of her having unlawfully and wrongfully taken the life of the insured, we think it would be a reproach to the jurisprudence of this state if she could take part of this money as dower, thereby profiting by her own wrongful act and taking indirectly what she could not legally take directly as beneficiary. In *Slocum, Adm'r,* v. *Metropolitan Life Insurance Co.,* 245 Mass. 565, 139 N. E. 816, 27 A. L. R. 1517, it was said: "The same principle of public policy which precludes him from claiming directly under the insurance contract equally precludes him from claiming under the statute of descent and distribution." Citing numerous cases.

The case of *De Zotell* v. *Mutual Life Insurance Company of New York,* 60 S. D. 532, 245 N. W. 58, decided in 1932, contains a very extensive treatise upon this question. In this case the South Dakota Supreme Court frankly stated that it should not affirm any judgment for the payment of the insurance money to the administrator of the insured unless it be demonstrably certain that such payment will not in any manner result in permitting the wrong doing beneficiary to participate in the proceeds, either directly or indirectly. That court further said:

"We think that the principle of sound public policy which demands that a sane, felonious killer should not profit by his crime should be applied as often as and whenever any claim is made by such killer, whether under contract, will, or statute. The decisions which we prefer to follow attain the result which everyone (and even the cases holding the contrary) admits ought to be attained if possible. We cannot accept as well grounded the argument that such decisions amount to unwarranted judicial interference with legislative action. To discuss the point further or to quote from the opinions would not be profitable. . . . We cannot persuade ourselves that there was ever any legislative intent that our statutes of descent and succession, general or special, however broad and unambiguous and lacking in exceptions in their terms, should operate in favor of a sane, felonious killer. We announce it as the law of this state that such statutes will not be permitted so to operate unless and until the legislature shall specifically and affirmatively so enact.

"It follows from this view that the plaintiff, Elnora De Zotell, cannot take or receive any part of the insurance money from the administrator of the insured or from his estate by virtue of any statute, general or special. There being no surviving child of the insured, the insurance money, when received by the administrator, will go as general assets of the estate, first, and in so far as may be necessary, to the payment of claims of creditors and expenses of administration, and then, pursuant to the general statutes of descent, to the heirs at law of the insured in like manner as would be the case if Elnora De Zotell had predeceased the insured and had died intestate and without heirs."

We have concluded that under the evidence in this case, and in line with the holding of the trial court, the appellant is not entitled to participate in the insurance money, and that the heirs at law of the deceased are entitled to this money in like manner as would be the case if the appellant had predeceased the insured and had died intestate and without heirs, as was held in the De Zotell case, *supra*.

The decree is, therefore, affirmed.