In the Matter of the Estate of Charlie
Frank SARGENT, Deceased *v.* BENTON STATE
BANK, Administrator of the Estate of Charlie
Frank SARGENT, Deceased

83-73                                      652 S.W.2d 10

Supreme Court of Arkansas
Opinion delivered June 6, 1983
[Rehearing denied July 5, 1983.]

*Perroni & Rauls, P.A.,* by: *Samuel A. Perroni* and *Stanley D. Rauls;* and *William R. Wilson, Jr.,* for appellant.

*Hardin & Hardin, P.A.,* by: *Joe K. Hardin* and *Robert N. Hardin,* for appellee.

STEELE HAYS, Justice. Charlie Frank Sargent was fatally shot on February 18, 1980. His wife Kate, and his three sons Donald, Roy and Cecil were all charged with first degree murder. The charges against Cecil and Roy were dismissed, Donald was convicted of first degree murder and Kate Sargent of second degree murder.

Charlie Sargent died intestate and the administrator of his estate petitioned to exclude the wife and sons from inheriting because of their involvement in his death. The Chancellor found that all four had participated in the murder and excluded them from the estate. Cecil Sargent is appealing the order on the grounds that the evidence is insufficient to show his participation in his father's murder. We agree with appellant and reverse the Chancellor.

Appellee's petition charged that Cecil had participated in a conspiracy to murder the father. He argues that the evidence would support Cecil's participation as an accomplice or an accessory after the fact, as well as a conspirator in the wrongful and unlawful death of his father. Under Arkansas law for reasons of sound public policy one who wrongfully kills another is not permitted to profit by the crime. *Wright* v. *Wright,* 248 Ark. 105, 449 S.W.2d 952 (1970). *Horn* v. *Cole,* 203 Ark. 361, 156 S.W.2d 787 (1941).

We believe the evidence presented in this case was not sufficient to find involvement by Cecil on any theory. The trial court's findings that related to Cecil are as follows: 1) Donald Sargent had discussed killing the father with other members of the family; 2) Donald shot his father while all of the family members were in the home; 3) the wife and

three sons removed the father from the home after the shooting; while he was still alive, and took him to the place where the body was found. The deposition of the Medical Examiner reflects that when the body was doused with kerosene Mr. Sargent was dead at the time. Mr. Sargent lived a very short time after receiving the four wounds. The only way the Court can reconcile the testimony of the parties to Dr. Malak's report and deposition is that after Mr. Sargent was taken in the truck to the place where the body was found, one or more bullet wounds was inflicted at that time. Mr. Sargent died before the kerosene was poured on him; 4) the wife and all three of the boys participated in the murder of the father.

With nothing more, the first two findings tell us nothing of Cecil's participation. The third adds very little and is tempered by other considerations surrounding the incident which we will discuss further on. The last finding is simply conclusory. The appellee cites the following evidence in support of the trial court's findings: Cecil was at the table with his father when Donald first shot him; Cecil testified that his father asked him to call an ambulance but Cecil said he didn't know the number, and that he also helped carry his father to the truck; Cecil, Roy and the mother followed the truck in their car; Roy had placed gasoline in a firebomb in the car before the left to follow Donald; Roy saw Cecil keep the father in the truck as Donald was pouring gasoline on him; Donald watched as the truck in which his father was placed was set on fire with the firebomb; Cecil helped push the truck after the firebomb didn't work; Roy testified that all four family members discussed what to tell the police; Cecil did not tell the police the whole truth when first questioned.

We believe the disputed factual issue here is to be decided by a preponderance of the evidence, as in civil cases generally. [See *Vesey* v. *Vesey*, 237 Minn. 10, 53 N.W.2d 809 (1952)]. Still, it may be well to examine relevant criminal laws. Ark. Stat. Ann. § 41-707[1] requires that one have the

---

[1]41-707. Criminal conspiracy. — A person conspires to commit an offense if with the purpose of promoting or facilitating the commission of any criminal offense he:

(1) agrees with another person or other persons:

*purpose* of promoting a criminal offense and *agrees* with another that he will engage in that activity or will aid in planning it. None of the evidence appellee offers goes at all convincingly to any of these elements. Cecil's presence at the home at the time of the shooting tells us nothing of his purposefulness or indicates *any* agreement. Nor is mere association or presence at the scene sufficient to prove conspiracy. *U.S.* v. *James*, 528 F.2d 999 (5th Cir. 1976). As to Donald discussing the killing of the father, the appellee points to no evidence that goes beyond mere discussion. Evidently, Donald was given to loose talk about his intentions, but the indications are that no one took him seriously. More importantly, there is no evidence that shows with whom Donald had discussions and no evidence that Cecil was present. Nothing points to anything even suggesting that Cecil was involved in any agreement to purposefully murder his father.

The activities Cecil was involved in that followed Donald's shooting Sargent leave us with many questions. Absent any evidence of conspiracy, even assuming the father was still alive at the time the family moved his body in the truck, we can't say that there were conspiratorial acts. The Commentary to § 41-707 emphasizes this point by noting that the statute excludes from its provisions "application to persons who engage in conduct that furthers the ends of a conspiracy but who have no purpose to do so. This is so even if the persons knows his conduct assists in the accomplishment of the criminal objective." Nor could we say that Cecil's acts made him an accomplice. Ark. Stat. Ann. § 41-303[2] requires one have the *purpose* of promoting the offense and that he solicits or encourages another in

(a) that one or more of them will engage in conduct that constitutes that offense; or

(b) that he will aid in the planning or commission of that criminal offense; and

(2) he or another person with whom he conspires does any overt act in pursuance of the conspiracy.

[2] 41-303. Criminal Liability for conduct of another — Accomplices. (1) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:

(a) solicits, advises, encourages, or coerces the other person to

committing the offense or aids or attempts to aid another in committing the offense. Cecil's actions themselves, with no evidence of conspiring, or any other evidence of purpose to commit the crime coupled with the fact that Donald had already delivered the fatal wounds leaves an accomplice theory unsupported. The offense of accessory after the fact has now been abolished (see Commentary to Ark. Stat. Ann. § 41-302) and such activity now comes under the authority of Chapter 28, Obstructing Governmental Operations. Cecil's activities might constitute such an offense, but the competing considerations surrounding his acts, and the acts themselves make his involvement far too attenuated to sustain the results of the court's decision.

In sum, it was the burden of the appellee to show that Cecil was aware of a plan to kill his father and that he participated in the furtherance of that plan, or, at least, he concurred in it. Failing in that, there must be evidence of Cecil's actions after the shooting from which those same conclusions can be rationally inferred. Here, there is nothing in the evidence before the shooting to implicate Cecil, except that he happened to be in the house where he lived eating supper along with the rest of the family. Moreover, Cecil's actions after the shooting are as consistent with a fear of his older brother, as with a desire to carry out a murder scheme. The two explanations are equally plausible. That being so, when the circumstances in their entirety are weighed, i.e. Cecil's immaturity, Donald's threats and occasional physical abusiveness of his brothers, the fact that

---

commit it; or

   (b) aids, agrees to aid, or attempts to aid the other person in planning or committing it; or

   (c) having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

   (2) When causing a particular result is an element of an offense, a person is an accomplice in the commission of that offense if, acting with respect to that result with the kind of culpability sufficient for the commission of the offense, he

   (a) solicits, advises, encourages or coerces another person to engage in the conduct causing the result; or

   (b) aids, agrees to aid, or attempts to aid another person in planning or engaging in the conduct causing the result; or

   (c) having a legal duty to prevent the conduct causing the result, fails to make proper effort to do so.

Cecil was said to be close to his father, the absence of any motive by Cecil, and the state of shock and confusion which may well have accompanied the witnessing of those extraordinary events, they lead us to the conclusion that a finding that Cecil knowingly participated in the death of his father is clearly against the preponderance of the evidence. (ARCP 52).

The decree is reversed and the cause remanded for further orders not inconsistent with this opinion.

ADKISSON, C.J., and GEORGE ROSE SMITH and DUDLEY, JJ., dissent.

GEORGE ROSE SMITH, Justice, dissenting. My strong disagreement with the court's opinion is based on two considerations: First, as the opinion itself recognizes, this is a civil case in which the controlling question is whether the trial judge's finding that Cecil Sargent participated in the murder of his father is clearly against the preponderance of the evidence. Whether he was technically a principal, an accomplice, or an accessory is immaterial. Second, we must view the evidence in the light most favorable to the trial judge's decision, deferring to his judgment in matters of credibility.

This murder was planned in advance, with a homemade gasoline bomb and two gallons of gasoline in readiness for the burning of the body. Donald shot his father at the house, apparently striking a major artery in the arm, but that was not the fatal wound, though it would eventually have caused death if not treated. Dr. Malak testified, and the trial judge indicated, that the immediate cause of death was two bullet wounds in the chest, making two holes in the lungs and one in the heart. Dr. Malak said that the lung wounds caused massive bleeding in the chest cavity within ten minutes and that the victim could have lived only a very, very short time. Yet some 45 minutes elapsed between the first shooting and the consummation of the crime three miles away in the truck. For that reason the trial court found, with justification, that one or more bullet wounds were inflicted at the place where the wife and three sons tried to burn the body. Death occurred there; so Cecil participated in

the killing and could not have been merely an accessory after the fact.

Cecil Sargent is not exactly an immature and innocent child. He was 15 years old at the time, criminally responsible under the law. He was no longer going to school, but was working at a garage instead. He was his father's favorite son, but when his father in his agony appealed to Cecil for help three times, Cecil ignored his pleas each time. When Cecil was charged along with the other three survivors with murder, he successfully bargained for immunity in return for turning state's evidence and testifying against his own mother and his older brother. He has admittedly told so many lies about his connection with the homicide that the trial judge was fully warranted in disregarding his self-serving statements at the hearing below — a hearing at which he was repeatedly evasive in his testimony, professing not to remember incriminating facts until he was confronted with his own testimony at the trial of his mother and brother.

As for Cecil's participation in the murder, soon after the first shooting Sargent appealed to his favorite son, Cecil, to call an ambulance, but Cecil gave the ridiculous answer that he didn't know the number — as if a person had to know a telephone number to call an ambulance or the fire department in an emergency. After the shooting the group stayed at the house for a considerable length of time. Sargent was not able to walk, but Cecil and Donald held him upright between them and forced him to stumble with them to the truck. The father again begged his favorite son to help, to knock Donald in the head, but again Cecil refused to help him.

Despite Cecil's supposed fear of Donald, not asserted until weeks later, Cecil willingly got in the car with his mother and brother and followed Donald's truck for three miles. There Sargent got out of the truck, but Cecil and Donald pushed him back in. Sargent was still alive when Donald threw gasoline on him. Sargent again appealed to his favorite son, screaming for help. In Cecil's own words in his taped statement to the police: "Yeah, he screamed. He told me to knock him [Donald] in the head, please Cecil

knock him in the head." Later on, when the fire failed to spread from the bed of the truck to the cab, where Sargent was, Cecil helped the others try to push the truck down the embankment by the road, presumably to create the appearance of an accident. When a car was seen approaching, all four of the survivors "piled" into their car and "took off," leaving Sargent apparently still alive and suffering. At the hearing below Cecil piously testified that when he got home he went to bed. "I was so upset and in a strain. . . . It upset me real bad. . . . Yes, sir, I was upset for about two weeks after my daddy died."

Not so upset, however, that he was unable to join with the other three in deciding what to tell the police. When he was finally questioned, more than two weeks after the murder, he first said that after the shooting he went to bed, thinking Donald had taken his father to the hospital. An hour later, after the officers had questioned the others, Cecil admitted that he had helped carry his father to the truck. At still a third interview, some four hours later, he finally revealed his part in the murder. In that long interview, conducted in his mother's presence and taped, Cecil said not one syllable about being afraid of Donald or having been threatened by him. That came later, but when he was asked at the hearing below just what were Donald's prior acts of violence, he said Donald threw a screwdriver at Roy once, hitting him in the knee, and that he himself and Donald had a couple of fist fights. That was all. I find no independent support in the record for Cecil's statements that he was afraid of Donald or had been threatened by him. Quite evidently the trial judge, who had the advantage of observing Cecil's manner on the witness stand, did not believe him.

The administrator of the estate, which consisted primarily of a house and two acres, plus over $30,000 in life insurance, filed this petition to exclude the widow and the three sons from inheriting the estate and receiving the insurance money. The widow and Donald were hardly in a position to resist, having already been convicted of Sargent's murder. Roy had scant grounds for a defense, having admitted to the officers that he helped plan the murder by making the gasoline bomb two or three days before the murder and having melted the gun with a blowtorch

afterwards. That left only Cecil to disclaim any responsibility for what was in fact a group murder. He now appeals from the adverse judgment in the hope of being declared to be the sole eligible beneficiary, thus keeping the money and property in the family. I am dismayed that the strategy has proved successful.

ADKISSON, C.J., and DUDLEY, J., join in this dissent.