**George D. ELLIS, Administrator of the Estate of William J. Scroggins, Deceased, Plaintiff,**

**v.**

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY and Farmers New World Life Insurance Company, Defendants,**

Sharon Scroggins, Estate of William J. Scroggins, Deceased, by Its Duly Authorized Executors, Joel Price and Nora Marks Scroggins, Third-Party-Defendants.

**No. LR-C-81-141.**

United States District Court, E.D. Arkansas, W.D.

May 8, 1984.

Ray Baxter, Benton, Ark., for plaintiff.

James D. Storey, Wright, Lindsey & Jennings, Little Rock, Ark., for Farmers New World Life Ins. Co.

Don F. Hamilton, House, Holmes & Jewell, Little Rock, Ark., for John Hancock Mut. Life Ins. Co.

Joel W. Price, Fort Smith, Ark., for Sharon Scroggins and Joel Price.

John Tarlton Olivier, Sunset, La., for Nora Marks Scroggins.

## MEMORANDUM OPINION

ROY, District Judge.

The present case involves questions relating to insurance proceeds sought to be paid on the life of William Scroggins, who was killed on June 17, 1980. The parties involved are as follows:

1. The original plaintiffs in this suit were Stephanie Sonnier and Stacy Scroggins, the daughters of William Scroggins and Nora Scroggins, his first wife. Although William and Nora separated some three to five years before his death, no divorce was ever obtained. The Court al-

lowed the plaintiff to amend the pleadings so as to substitute George Ellis, the administrator of the estate of William Scroggins, as plaintiff.

2. John Hancock Mutual Life Insurance Company ["John Hancock"].

William Scroggins obtained the John Hancock policy while working for C.F. Bean Corporation, a company out of New Orleans which does dredging work on the navigable waters of the United States. John Hancock has tendered into the Court the proceeds from its policy and asks the Court to determine the rights to the proceeds. Sharon Scroggins is the named beneficiary.

3. Farmers New World Life Insurance Company ["Farmers"].

Less than one month before William Scroggins' death, William and Sharon Scroggins, his bigamous wife, procured from Farmers an insurance policy on the life of William Scroggins. Said policy named Sharon Scroggins as primary beneficiary and her two daughters by a previous marriage were named as second beneficiaries.

4. Sharon Scroggins.

William Scroggins and Sharon Scroggins (Major) were married on August 23, 1979, without the benefit of William obtaining a divorce from Nora Scroggins.

5. Nora Scroggins.

Nora Scroggins and William Scroggins had been married for approximately 20 years prior to their separation.

6. Joel Price.

Mr. Price represented Sharon Scroggins when she was charged and arrested for the murder of William Scroggins. Sharon Scroggins assigned any recovery she may recover on the insurance policies to Joel Price.

The plaintiff, administrator of the estate, contends that although Sharon Scroggins is the named beneficiary under both policies, she conspired and in fact contracted with Ruby Lee Henry and Randall James to have William Scroggins murdered. Ruby Henry and Randall James are now serving 30- and 40-year terms, respectively, for the death of William Scroggins. Plaintiff contends that since Sharon Scroggins conspired and contracted to have William Scroggins killed, under Arkansas law, the proceeds of the policies go to the estate. Farmers contends that not only did Sharon Scroggins conspire to have William Scroggins killed, but that she procured the policy with Farmers with the purpose and intent of having William Scroggins killed. Therefore, Farmers contends that the Farmers policy is void *ab initio*. Sharon Scroggins in her deposition, denies that she played any role in causing the death of William Scroggins.

The questions to be decided in the present case are as follows:

(1) Did the plaintiff and defendant Farmers sufficiently prove that Sharon Scroggins was an active participant in the conspiracy to bring about the death of William Scroggins?

(2) Did Farmers sufficiently prove that William Scroggins actively participated in the procurement of the Farmers insurance policy?

(3) What is the legal effect, regarding the validity of the Farmers' policy and the distribution of the proceeds, if Sharon Scroggins conspired to have William Scroggins killed?

The nature of William Scroggins' work required him to be away from home for two weeks and home for one week. After separating from Nora Scroggins, he met and married Sharon Scroggins, who had been married twice previously, and who married Walt Majors subsequent to William Scroggins' death. Sharon and William Scroggins resided in Fort Smith, Arkansas, originally in an apartment at Briarwood Apartments. In the spring of 1980 they moved into a home on 32nd Street in Fort Smith. It was while they lived in the apartment that Sharon Scroggins met Ruby Lee Henry and Randall James. Ruby was a friend of one of Sharon's daughters, and Randall sometimes worked on Sharon's

family's cars. Ruby and Randall spent the night at Sharon's at times, and Sharon loaned them small amounts of money on occasion. Ruby and Randall were present during some of those times when William Scroggins was home. No evidence was presented which indicated that there were ever any disagreements among William Scroggins and Ruby Henry or Randall James.

The testimony of Ruby Henry and Randall James, received by the Court in the form of depositions as well as videotapes of certain portions of the depositions, revealed that several months before the murder, Sharon Scroggins approached Randall James and proposed that he murder her husband for a price to be negotiated. Initially Randall James thought she was joking, but Sharon Scroggins raised the subject during subsequent visits. Finally, it was agreed that Sharon Scroggins would pay Randall James $500.00 before the murder and $500.00 after the murder. Randall James also stated that he was supposed to receive more money after the insurance proceeds were paid. The testimony of Ruby Henry and Randall James further indicates that Randall James received $500.00 from Sharon Scroggins only a few weeks before the murder as partial payment for the murder of her husband. Although the testimony is a little conflicting as to how the money was paid, it appears that at least a portion of it was received at a parking lot behind the Briarwood Apartments and another portion was received in the bedroom where Randall James and Ruby Henry slept in Henry's mother's house on Rawleigh Street.

At the time the real estate transaction involving the purchase of the Scroggins' home was closed in the spring of 1980, a standard homeowner's policy was purchased from W. Larry Gilkey Insurance Agency of Fort Smith. At that time, Larry Gilkey attempted to sell Mrs. Scroggins a decreasing term life insurance policy as mortgage protection. At that time the policy was declined.

According to Gilkey, a decreasing term life insurance policy is one of the least expensive policies on the market. Although the monthly premium payment remains the same during the life of the policy, its beneficial value to the policyholder decreases. For example, a $30,000 decreasing term policy would pay $30,000 to the insured's beneficiaries during the first year it was in force. However, in the fifth year of its term, its value would decrease to $25,000; the tenth year, $20,000; and so forth. The policy is often marketed as mortgage protection since a mortgagor's indebtedness would also decrease during the term of the life insurance policy.

On or about May 15, 1980, Mrs. Scroggins returned to the Gilkey agency for the purpose of taking out a decreasing term policy on the life of her husband. When she appeared at the agency she was told that the policy could not be issued without her husband first signing the application. According to Larry Gilkey and Jo Anna Hill, the agency's secretary, Sharon reacted angrily and began cursing at both of them, and stated something to the effect that "You mean if something should happen to him, I'll be up the creek!" Sharon Scroggins, although not present at the trial, stated in her deposition that the reason she was upset was because approximately two weeks earlier her son-in-law was almost killed while working on a barge. However, Mr. Gilkey testified that Sharon Scroggins never mentioned anything to him about her son-in-law falling off a barge. Nor did any other witness corroborate Sharon Scroggins' account.

About two weeks after the encounter with Mr. Gilkey and Ms. Hill, Sharon Scroggins returned to the Gilkey Agency with her husband. On May 27, 1980, less than one month before his murder, he applied for a $30,000 decreasing term policy, after answering a series of routine questions posed to him by Gilkey. Later that same day he submitted himself to a standard 15-minute physical examination conducted by a paramedic. According to the testimony of Nora Scroggins, his legal wife, her husband never purchased a life

insurance policy during their twenty years of marriage.

By mid-June, after Randall James realized that Sharon Scroggins was serious in her desire to have her husband killed, he and Ruby Henry left their small baby daughter, named Stormy, with Sharon for her to keep while they were gone. They left on a Friday to drive to Memphis, where William Scroggins was working, but got too drunk and spent the night in Little Rock. They had with them a .357 Magnum which they had purchased at Fort Smith after the first installment was paid by Sharon. The next day they went to Memphis, Tennessee. Sharon had provided them with a map of where William could be found. They began to have second thoughts about what they were going to do and made repeated collect calls to Fort Smith trying to tell Sharon they could not find the boat. During one of the conversations, Randall James and Ruby Henry told Sharon they needed more money, so she wired them $70 or $75 through the Western Union. It was also during one of the conversations that Sharon reminded Randall James she had their baby in such a way that Randall James was afraid she might harm their baby if the job were not accomplished. According to the testimony of Randall James and Ruby Henry, they drove to the barge in the middle of the night after frequenting several bars, and Henry went down to the barge to lure William Scroggins off the boat by telling him that Sharon and Walt Majors were having an affair. After William Scroggins and Henry got to the car where James was waiting, they all got in the car and drove to an isolated area in West Memphis. James contends that they told William that Sharon had wanted them to kill him. William Scroggins stated he would pay them to kill Sharon. James answered, "no." Then James and William Scroggins got out of the car, James with the gun in his hand. William Scroggins threatened to put all three of them, Sharon, Henry, and James, in the penitentiary. Thereafter, James started shooting and William Scroggins died as a result of the gunshot wounds.

James and Henry then drove back to Fort Smith and met Sharon Scroggins and Walt Major at a Sonic drive-in. James and Henry told Sharon the job was done, and they went to a motel where Sharon gave them money to pay for their lodging. Sharon was given the spent shells that had been used to kill William Scroggins.

Henry and James stayed with Sharon Scroggins off and on during the next month, making side trips to Dallas and Oklahoma between short visits. They then travelled to Michigan from which they placed a call to Sharon and asked her when they could get more money from the insurance proceeds. After being put off by repeated promises that the payments would be forthcoming, James threatened to tip off police authorities as to Mrs. Scroggins' involvement in the murder. Instead, authorities were tipped off as to James' and Henry's involvement and in August 1981 they were arrested and charged with first-degree murder.

In Sharon Scroggins' deposition she admitted that she had loaned money to Henry and James, but denied the amounts were substantial or that they were for having her husband murdered. She also admitted that she gave the couple directions to her husband's dredge, but said that was so James could meet with him and apply for a job on the river. She also admitted Henry and James called her collect from Memphis, but said that they were only inquiring about the health of their baby and also to request $75 to pay for their trip back to Fort Smith. She admitted wiring the $75 to them. Sharon Scroggins stated that she did not learn of her husband's death until one week thereafter.

The Court is not persuaded by the explanations given by Sharon Scroggins. Since William Scroggins was home for one week out of three, there appears to be no particular reason that Randall James would have to drive to Memphis to visit with William Scroggins about a job. Furthermore, even if the Court were to believe that Sharon Scroggins did not learn of her husband's death until one week thereafter, she did

know that Ruby Henry and Randall James had been in West Memphis and visited her husband around the same time he was killed. Seemingly, she would have put these two facts together and at least suspected that Henry and James had been involved in the murder. Yet, even after acquiring this knowledge, she continued to entertain the couple as overnight guests.

Additional facts indicate an incredible lack of concern on her part for William J. Scroggins. Stephanie Sonnier, William Scroggins' daughter, testified that Sharon Scroggins contributed nothing toward the funeral expenses and she did not even attend the funeral. The Court recognizes that the most damaging evidence linking Mrs. Scroggins to her husband's murder is the testimony of admitted felons, whose testimony is subject to intense scrutiny. The Court is also aware of some of the inconsistencies in their testimony, as pointed out by counsel for Sharon Scroggins. However, the Court has carefully scrutinized the testimony and demeanor of Henry and James in their depositions and videotapes and concludes that the inconsistencies are minor when considering their testimony as to the overall scheme.

At the trial, Mr. Joel Price sought to introduce the prior statements of Ruby Henry and Randall James which were given to authorities subsequent to their arrest. Objections to the admissibility were raised based upon Rule 613(b) of the Federal Rules of Evidence. Mr. Price relies upon various sections of Rule 803 of the Federal Rules of Evidence for his support. Although the Court is not persuaded by the arguments advanced by Mr. Price regarding the admissibility of the prior statements, the Court nevertheless has considered the statements, for whatever probative value they may have, and has concluded that any inconsistencies that appeared between the statements and depositions were minor in relation to the consistent statements given with regard to the overall scheme.

Furthermore, a careful examination of the deposition of Sharon Scroggins, in light of the testimony of all of the witnesses who testified, leads the Court to conclude that the plaintiff has proved not only by a preponderance of evidence, but by clear and convincing evidence, that Sharon Scroggins contracted and conspired with Henry and James to have William Scroggins killed.

The Court is not persuaded by the argument of counsel for Sharon Scroggins that the conspiracy was terminated as to her by the fact that the actual killers renounced the original conspiracy and thereafter acted on their own volition. This defense would work only to remove those who actually renounce the conspiracy. Sharon Scroggins never made any effort to remove herself from the conspiracy. In fact, the evidence indicates that she in fact placed the killers under duress by intimating she would harm their child if the "job" were not completed.

 Since the Court has concluded that for purposes of this suit, the evidence indicates that Sharon Scroggins conspired and contracted to have her husband killed, it must also conclude that Sharon Scroggins cannot recover the proceeds as a beneficiary under the policies. It is well settled in Arkansas that when the beneficiary in a life insurance policy wrongfully kills the insured, public policy prohibits a recovery by the beneficiary. *Cockrell v. Life Insurance Co. of Georgia*, 692 F.2d 1164 (8th Cir.1982); *Taylor v. United States*, 113 F.Supp. 143 (W.D.Ark.1953), *aff'd*, 211 F.2d 794 (8th Cir.1954); *Sovereign Camp, W.O.W., v. Clark*, 184 Ark. 1035, 44 S.W.2d 336 (1931); *Cooper v. Krisch*, 179 Ark. 952, 18 S.W.2d 909 (1929); *Inter-Southern Life Insurance Co. v. Butts*, 179 Ark. 349, 16 S.W.2d 184 (1929); *Calaway v. Southern Farm Bureau Life Insurance Co.*, 2 Ark. App. 69, 619 S.W.2d 301 (1981).

 The next question is whether the Farmers policy is void *ab initio*, thereby precluding any liability on the part of Farmers. The general rule of law is that a life insurance policy is void from its inception and the insurer is relieved of all liability upon the subsequent homicide of the

insured where it is proved that a beneficiary procured the policy possessing a then present intention to murder the insured. *New England Mutual Life Insurance Co. v. Null,* 554 F.2d 896, 900 (8th Cir.1977).

■ It was Sharon Scroggins who expressed the interest in the life insurance policy and who made the original inquiry. It was Sharon Scroggins who became agitated and cursed when she was told her husband's signature was required. Although William Scroggins did, in fact, go to the insurance agent, sign the application, and submit himself to a 15 minute standard physical conducted by a paramedic, the Court is of the opinion that William Scroggins did not participate in the procuring of the insurance in such a manner as to become, in effect, the party who contracted with the insurance company. In fact, William Scroggins was nothing but a mere innocent instrumentality in Sharon's scheme, and Sharon procured the policy with the present intention to murder the insured.

Based upon the foregoing, the Court must only determine who is entitled to the John Hancock proceeds. Arkansas cases have generally held that when the beneficiary in a life insurance policy unlawfully kills the insured, the amount of the insurance becomes an asset of the insured's estate. *Cockrell v. Life Insurance Co., supra; Horn v. Cole,* 203 Ark. 361, 156 S.W.2d 787 (1941); *Inter-Southern Life Insurance Co. v. Butts, supra.*

■ Based upon the foregoing, the Court hereby holds that the plaintiff, the administrator of the estate of William Scroggins, is entitled to the John Hancock proceeds which have been interpled in the Court, and that Farmers New World Life Insurance Company is relieved from any liability as to the payment of proceeds under the policy which is the subject of this action.